**Robert L. KENDALL, Plaintiff,**

v.

**UNITED AIR LINES, INC., Defendant.**

**No. 75 C 727.**

United States District Court,
N. D. Illinois, E. D.

Aug. 25, 1980.

---

Ronald J. Clark, Matthew Piers, Clark, Thomas & Piers, Chicago, Ill., for plaintiff.

Earl G. Dolan, Kenneth A. Knutson, Chicago, Ill., for defendant.

## MEMORANDUM DECISION

MARSHALL, District Judge.

■ Plaintiff Robert L. Kendall is a former pilot with United Air Lines and a member of the Worldwide Church of God. In this action for declaratory, injunctive and monetary relief, he claims that United was guilty of religious discrimination in terminating his employment when he refused to report for work on his Sabbath. Kendall's claims are based on Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.[1] and the First and Fifth Amendments to the federal constitution. Jurisdiction is invoked under 42 U.S.C. § 2000e and 28 U.S.C. §§ 1343, 2201 and 2202.

### Findings of Fact

The parties submitted to a bench trial and presented three witnesses. Plaintiff testified on his own behalf. He also called John Traynor, who is presently employed by United as a DC–8 captain and is based in San Francisco. As Chairman of the Contract Interpretation Committee in the San Francisco domicile for the Air Line Pilots Association (ALPA), Captain Traynor has considerable experience and expertise in testifying on behalf of pilots on issues of contractual interpretation before industry arbitration panels. ALPA represented United's pilots, including Kendall, in collective bargaining with the company. United called one witness, Captain Melvin Volz, who is presently employed as vice president

---

1. Title VII's prohibition against religious discrimination is created by the interplay of sections 2000e(j) and 2000e–2(a)(1). Together these sections make it an unlawful employment practice if an employer fails to make a reasonable accommodation to the religious practices of its employees, unless such an accommodation would impose an undue hardship on its business.

of flight operations for the company's central division. He was Kendall's flight manager at the time of his discharge.

On May 27, 1969, Kendall was hired by United as a pilot and was assigned to the Chicago pilot domicile as a Second Officer in the Boeing 737 fleet. Seven months later, in December, 1969, Kendall joined the Worldwide Church of God. Members of this church are prohibited from working on their Sabbath, which occurs between sunset Friday and sunset Saturday, and from working on thirteen other religious holidays during the year. The sincerity of Kendall's beliefs in his religion is unquestioned. (T. 83).

Kendall's membership immediately created a potential conflict with his flight schedule, since United's flights run seven days a week. However, because of unilateral efforts in adjusting his flight schedule, Kendall was able to avoid an actual conflict until July, 1972. To understand how conflicts arose or could be avoided, we must give a rather detailed description of United's scheduling system.

Flight schedules for United's pilots are determined according to the provisions of a collective bargaining agreement between United and ALPA. Two types of monthly schedules are used: a scheduled line of flying and a reserve schedule. "Line-holders" receive a schedule which assigns them to specific flights and specific days off. They therefore know in advance the exact trips they will fly on each of their working days. Reserve pilots receive a schedule which only specifies their days off. On working days, reserves must be on call to replace scheduled pilots who are unavailable or ill and to provide coverage for unscheduled flights such as charters. A reserve pilot has no idea in advance what flights he will have or even whether there will be one. In addition, very few reserve pilots have Fridays or Saturdays off, because weekends are peak travel periods.

Scheduled lines of flying and reserve pilot schedules are prepared for each particular configuration of aircraft equipment (e. g. 747, DC–8, 737), pilot status (e. g. captain, first officer or second officer), and pilot domicile (e. g. San Francisco, Chicago, Newark). In 1972, there were ninety-two different combinations of equipment-status-domicile. (T. 131). Within each of these combinations, United created a number of different availability patterns to assure that pilot coverage was relatively uniform during the month.

These monthly schedule patterns are published and posted in advance of their effective date so that pilots may bid on their preferences. The bid consists of the pilot's seniority ranking, and schedules are awarded to the most senior bidder. In general, the more senior pilots received scheduled lines of flying, and the less senior pilots received reserve schedules. (T. 22, 143). In addition, the senior pilots generally bid for schedules with weekends off. (T. 144).

United's scheduling procedures provided a number of methods by which a pilot could modify his schedule for personal reasons after the schedule went into effect.[2] If the pilot was a line-holder, he could drop a scheduled trip and sign up in the open flying book to fly an equivalent trip on one of his days off. (T. 24). A drop had to be approved by the flight manager (T. 55), who was something like a chief pilot and had responsibility for supervising a group of pilots within all three classifications (e. g. Boeing 727 pilots at O'Hare). (T. 137–38). The flight manager had discretion whether or not to grant the drop, but the sole factor appeared to have been whether there was sufficient reserve availability to cover the dropped trip. (T. 25–26, 57). The contract did not place any limitation on the number of times a drop could be allowed (see § 3–I–1–a–(7)), and dropping was a common practice among line-holders in 1972 (T. 33, 56). Among the reasons used to justify a drop were weddings, golf dates, and attendance at a retirement party. (T. 33).

---

2. We omit any discussion of methods of schedule adjustment based on a pilot's military obligations, or a birth or death in the pilot's family. (See Deft. Exh. 1).

In addition to dropping a trip, line-holders could swap flights with other line-holders.[3] Unlike drops, swaps were arranged between pilots themselves, without the approval of the flight manager, even though the contract technically required company approval. (See § 3–I–1–a–(6); T. 33–37). Use of swaps was "reasonably common." (T. 34).

If the pilot was a reserve, parallel methods of schedule adjustment were available. Instead of shifting trips, reserves could shift their days off. The 1970 contract did not specifically authorize shifting by reserves. However, this method was recognized in an April, 1972 company policy statement and in subsequent arbitration decisions as being an established working practice (Deft's Exh. 1, ¶–3C; Pltf. Exh. 1 & 2) (T. 43–44, 49). The flight manager had discretion whether to grant the shift request, subject to the availability of reserve coverage. (T. 42, 61, 69, 186, 223). Although the April, 1972 policy statement allowed shifting only in unusual circumstances or for military leave (T. 164–65), in practice shifts were commonly granted for a host of nonemergency reasons, such as parties, vacations, travel, playing golf, and maximizing the number of days off in a row. (T. 43, 52, 222–223).

In addition to shifting, reserve pilots could swap days off with other reserve pilots. (T. 42). Unlike shifting, which was accomplished independently of other pilots' schedules, swapping required the agreement of another pilot. (T. 126). Swapping between reserves did not occur very often. (T. 49).

Although a pilot's seniority could buy him a particular monthly schedule, it could not help him modify that schedule. (T. 120, 155–56). Schedule adjustments were granted purely on a first-come, first-served basis, and remained available so long as there was sufficient coverage. Every pilot had an equal right under the agreement to go to his flight manager and ask for a change in his schedule based on his personal needs. (T. 120).

With this description of United's scheduling system in mind, we return to an analysis of its applicability to Kendall's situation. Kendall's employment with United can be divided into four periods. From May to December, 1969, Kendall was a pilot but was not a church member, so no conflict between work and a Sabbath was possible. From December, 1969 until June, 1971, Kendall was an active church member and a United pilot, but was able to avoid any actual conflict. (T. 85). He had more seniority than about 450 of United's 6,000 pilots. (T. 188). Consequently he was able to successfully bid for line or reserve schedules with his Sabbath off. (T. 87). When conflicts occasionally loomed in his schedule, Kendall was able to drop or swap the scheduled flight or to shift his reserve days off. (T. 87–89, 103). Kendall's ability to avoid schedule conflicts was preserved so long as a buffer of junior pilots remained beneath him. From June, 1971 until June 20, 1972, Kendall was furloughed because of company belt-tightening, so again a conflict was forestalled. However, when Kendall was recalled on June 20, 1972, his religious convictions and his work collided head-on, resulting in his discharge on July 17. It is this recall phase of Kendall's employment which is the focus of the present controversy.

At the time of his recall, Kendall was the most junior Boeing 737 Second Officer in Chicago and the second most junior 737 pilot in United's entire system. Consequently, his bidding rights were very weak. For the last ten days in June, Kendall confronted only one possible weekend flying assignment, and his request for that Sabbath off was granted with no questions asked. (T. 90).

Kendall faced four potential weekend assignments in July. The pertinent set of reserve schedules for that month offered virtually no chance for avoidance. None had both Fridays and Saturdays off. One had all but one Saturday off. That schedule was bid by ten other pilots senior to

---

**3.** Line-holders could not trade scheduled trips with reserve pilots. (T. 58).

Kendall. Kendall was awarded a July schedule which required work on every Friday and Saturday. (T. 101). Kendall had ten days off during the month, but all were situated in the middle of the week. (T. 92).

Shortly after receiving his schedule, Kendall went to the crew desk [4] to ask that four of his days off be shifted to his four Sabbaths in the month. (T. 91). As soon as Kendall informed the crew desk that his request was religiously motivated, the desk referred Kendall to his flight manager to receive the proper clearance. The crew desk did not first check the availability of reserves for the days off which Kendall requested. (T. 92–93).

On the morning of Wednesday, June 28, three days before his July schedule became effective on Saturday of that week, Kendall met with his flight manager, Mel Volz, in Volz's office. (T. 91, 140). In addition to his present testimony, Kendall's recollection of his conversation is contained in a diary which he maintained contemporaneously with this and later meetings (Exh. C; T. 93). Volz's evidence was limited to his present testimony, and his statements generally contain less detail and less chronological exactitude than Kendall's.

In his diary (which was received in evidence by stipulation and without objection, T. 76) Kendall reports the June 28 morning meeting as follows. He told Volz that he was unable to fly trips scheduled between sunset Friday and sunset Saturday because of his religious obligations. Kendall asked Volz if he "could swap my days off in July for Friday and Saturday." Volz said Kendall could swap one or two days around occasionally but swapping all his days off in this manner would violate the contract. It would effectively give Kendall a new line which was better than his seniority warranted. It would also violate the terms of his employment, which was conditioned upon weekend availability. Kendall recalled checking a box on his pre-employment application which stated he was able to work weekends, but that statement was

made before he joined the church. Kendall said he was willing to work Sundays, Christmas, New Year's or any other time except the Sabbath. Volz said he realized Kendall was willing to make every possible sacrifice. Volz stated he would check into the matter and call Kendall at home later.

At trial, Kendall was cross-examined further about the type of accommodation he requested from Volz. He never considered swapping days off with another pilot because that method was no longer practicable. (T. 104–05). The main focus of his discussion with Volz with his request to shift his days off from the middle of the week to weekends. (T. 102, 106). Kendall implicitly denied asking Volz to simply drop his availability on weekends. (T. 105–06). He discussed other alternatives with Volz, but does not recall them specifically. (T. 102–03).

Volz's version of the conversation is essentially consistent with Kendall's. He agrees that some methods of accommodating Kendall's conflict were discussed more thoroughly than others. (T. 149). They discussed swapping with other pilots, but both agreed to reject it because Kendall did not have a good chance of finding enough people who would be available to swap on every Friday and Saturday during the month. (T. 149, 152). They briefly discussed a leave of absence, but Volz was of the opinion that it would only delay the problem, not solve it, despite the fact that Kendall would accrue seniority while on leave. (T. 150, 158). The "primary impetus" of the discussion, according to Volz was Kendall's request to "quietly" give him Fridays and Saturdays off. (T. 149–50, 153).

There are also some suggestions in Volz's testimony 1) that Kendall might not exchange his weekend drops for more weekday duty (see T. 164, 180) or 2) that Kendall wanted a present guarantee of no weekend assignments running indefinitely *in futuro.* (see T. 203). We reject these suggestions as an improper characterization of Kendall's

---

**4.** The crew desk maintains the detailed books which record scheduled trips and pilot cover-

age and also checks pilots in and out of their trips. (T. 38).

request for an accommodation. United admits that Kendall was a "very competent" employee (Bd. Hearing p. 56; T. 182), and that he promptly brought his religious obligations to the fore when unilateral attempts at accommodation failed. (T. 140–41). We do not believe he would shirk his responsibility to compensate for his reduced availability on weekends. (See also Bd. Hearing p. 86). And because schedules and seniority rankings change from month to month (T. 132–133), we find it very doubtful that Kendall's perspective was broader than a month-to-month time frame.

There is a further problem in defining Kendall's request. Kendall's Sabbath ran from sunset to sunset, while United's days ran from midnight to midnight. (T. 107). Consequently, was Kendall asking for complete protection from a conflict, requiring both Fridays and Saturdays off, or for partial protection, requiring only Saturdays off, since Saturday contained the majority of the Sabbath? The first alternative would require a shift of eight of Kendall's ten days off, while the second would only require the shifting of four days during the month. Kendall's own testimony on this issue is confused. In his diary, he stated that he asked Volz for both Fridays and Saturdays off. But at trial, he stated that he only asked for four days to be shifted. (T. 91, 102, 105–06). We questioned Kendall about this ambiguity. He explained that he considered himself available for any assignment up until sunset Friday, and would not decline a lengthy trip just because it ran into that day. He would work the trip until sunset, and then decline the last leg, unless unforeseen or emergency conditions made it imperative for him to complete the assignment. (T. 100, 109–111). It appears, therefore, that Kendall's ability to work on Fridays could only be determined on a case-by-case basis as the particular assignments arose. Because Kendall framed his June 28 request to Volz not in terms of resolving schedule conflicts as they arose, but in terms of resolving conflicts for the entire month of July and in advance of particularized assignments, we find that his suggested accommodation could have been

viewed only as a request for both Fridays and Saturdays off, which in essence is how Volz construed it.

At the end of his meeting with Kendall on the morning of June 28, Volz promised Kendall that he would report back to him after Volz had done some more research on possible methods of accommodation. (T. 94, 176). Volz admitted that Kendall's request put him "in quite a quandry," and he needed time to check with a number of other parties. (T. 159, 176–77). Volz contacted his superiors, the company's Personnel Department, and the local ALPA Schedule Committee. (Kendall Diary; T. 94, 177). That committee reviews schedules prepared by the company prior to posting to monitor the company's compliance with scheduling rules. (T. 177). The Committee chairman objected to Kendall's suggestion of extensively moving his days off, because it gave him superseniority and created a new line outside the contractually-mandated bidding procedure. (T. 180, 203).

Volz called Kendall with his report at about 2:00 p. m. on June 28. According to Kendall's testimony, Volz reached a consensus with his contacts that if Kendall could not work on his Sabbath, he was changing the agreement under which he was hired, and therefore was no longer useful to the company. (Diary; T. 94). At that point Kendall understood that he had been discharged. (T. 95). Kendall realized later on Friday afternoon of that week that his understanding had been erroneous. (T. 96).

Volz called Kendall the next day, which was Thursday, June 29, and asked him to come into his office for further discussions. (Diary; T. 95, 181). Volz asked if Kendall had reconsidered his position, and learned that his views had remained the same. They discussed whether it would be better for Kendall to resign or to be discharged, in terms of his employment record, his standing to invoke company grievance procedures, and his eligibility for unemployment compensation. Kendall said he didn't want to resign. Although Kendall was still under the impression that he was discharged, Volz denies that there was any such impli-

cation. (T. 95, 182). Volz also told Kendall that his check with the personnel department had revealed no other open positions within the company which would accommodate Kendall's Sabbath. Finally, Volz asked Kendall to put his position in writing. Kendall's letter is limited to an enumeration of his holy days, and a statement that he could not fly during those periods. (Exhibit B).

On the next day, Friday, June 30, Volz called Kendall in again to receive the company's written response to his position. (Diary; T. 95, 182–83). The company's letter reminded Kendall that he had originally agreed to work weekends, that the company operated seven days a week, and that contractually prescribed scheduling procedures resulted in his assignment to a reserve line requiring weekend availability throughout July. The letter stated that his services were sorely needed on weekends and that his recall "was at least partially based on our shortage of pilots during the peak week-end demand." It concluded that his failure to accept a scheduled assignment could result in his discharge. (Exhibit C).

In addition to this letter, Volz verbally informed Kendall on Friday afternoon that he was presently on the flight schedule and was expected to be available for an assignment the following day, which was July 1. (Diary; T. 95, 183–84). At that point, Kendall recognized for the first time since Wednesday afternoon, that he had not yet been discharged. (T. 95–96). Kendall told Volz that he intended to refuse any July 1 assignment, and that he would refer the crew desk to Volz for an explanation of his refusal. (T. 184).

The crew desk called Kendall at 5:30 a. m. the next morning, July 1, to assign him to a flight that day. Kendall refused the flight because of the conflict with his Sabbath. (Diary; T. 95–96). United then called the next pilot on the reserve list, and that man was able to take the assignment. (T. 100).

On July 3, Kendall called Volz to determine his employment status with United. Volz told him that his trip refusal was now a disciplinary matter and that he was off the flight schedule until it was resolved by a hearing in accordance with the contract. (Diary; T. 96).

On July 5, United issued a letter formally charging Kendall with refusing his assigned July 1 flight. (Exhibit D). The matter was set for hearing on July 12. Present at the hearing were Kendall, Volz, and Captain Cross, who was United's regional manager of flight operations. (Exhibit E).

The details of the hearing are contained in Kendall's diary. Kendall explained his strong desire to be a pilot and his equally sincere belief in his religion, and said it was unfair to force him to give up one for the other. Cross elicited Kendall's admission that he had agreed to work seven days a week when he was hired, but Kendall noted that he did not join his church until seven months after he started work. Kendall suggested that the contract be modified to allow a pilot to drop a trip for religious reasons, but Cross noted his lack of authority to consider this. Both Volz and Cross advised Kendall to exhaust internal company grievance procedures before filing with government agencies, and both commended him for conscientiously informing United of his religious needs before an actual conflict arose.

On July 17, Captain Cross sent Kendall a letter discharging him from United, effective immediately. (Exhibit E). Four days later Kendall filed charges of religious discrimination with the Illinois Fair Employment Practices Commission (FEPC) and the Equal Employment Opportunity Commission (EEOC). (Exhibits F and H). The FEPC found no substantial evidence to support the charges and dismissed the complaint on January 10, 1973. (Exhibit G). The EEOC issued a "right to sue" letter to Kendall on December 6, 1974. (Exhibit I).

On July 23, according to the diary, Kendall conferred with ALPA Grievance Chairman Wilsman for advice on pursuing the internal company remedy of appeal to W. E. Dunkle, Senior Vice President of Flight Operations. Wilsman mentioned that Kendall might get a leave of absence from

United until he had enough seniority to bid Fridays and Saturdays off.

On July 24, Kendall appealed his discharge to Captain W. E. Dunkle, who was United's Senior Vice-President for Flight Operations. At the hearing on August 10, the company was represented by Captain Treece, who acted as Dunkle's designee, and by a member of Dunkle's staff. Kendall appeared with Bill West, who was an ALPA Grievance Chairman, and with another ALPA observer. (Diary; Exhibit M). West urged the company to reinstate Kendall on a trial basis and to make a "special arrangement" with no precedential value. (Diary). Kendall also voiced a proposal. He saw no principled basis for United to allow a pilot to drop a trip for health reasons and to not permit a drop for religious reasons. (T. 99). So he suggested that after a pilot had unsuccessfully attempted to avoid a conflict by normal bidding procedures, he should be permitted to make a "religious trip drop." (Diary). This type of drop would have narrow applicability and would only affect about the twenty most junior men in the seniority list, because more senior pilots could avoid conflicts by normal procedures. (T. 99). Captain Treece's reaction to this proposal stuck in Kendall's mind—"he kind of laughed and he said, 'That very well might be feasible but it's intolerable.'" (Diary; T. 99).

Kendall then suggested that he be given a leave of absence until he accumulated sufficient seniority to bid the days off he needed. As he put it "a leave of absence might allow me to come back to work within a year when I have sufficient seniority to bid the days off I need." (Diary). Captain Treece's position, which was expressed both at the hearing and in a subsequent August 21 letter denying Kendall's grievance, was that Kendall had knowingly accepted seven-day-a-week availability at the time of his hiring, and that his intervening religious conversion required him to either adapt his principle to those stated conditions of employment or to leave the airline.

On September 6, 1972, Kendall submitted a grievance for arbitration before the five-member Pilots' System Board of Adjustment, which was organized under provisions of the Railway Labor Act, 45 U.S.C. § 184. The Board held a hearing in February, 1974, when it received testimony on the interaction among Kendall's requested accommodation, available scheduling alternatives, company efficiency, and the requirements of the collective bargaining agreement.

On September 27, 1974, the Board denied Kendall's grievance, finding that his discharge was for "just cause" and did not violate the collective bargaining agreement. The Chairman's opinion stated that

> For the Company to rearrange the schedules of Pilots who had bid for schedules in accordance with their seniority to "accommodate" Kendall would in fact adversely affect seniority rights of other Pilots. The Company has an affirmative obligation to observe the seniority rights of Pilots as reflected in the schedules bid by the Pilots. The Company would have no right to alter such bids or schedules for the purposes which Kendall sought to accomplish.

However, the two union members of the five-man board filed a concurring opinion in which they disagreed with the Chairman's analysis of the agreement. They did not believe that United would have violated the agreement if it had permitted Kendall to swap days off to accommodate his religious practices. They agreed with the Board's decision only because they found nothing in the agreement which permitted an employee to *insist* that the company must accommodate his religious practices.

On March 5, 1975, within ninety days of receiving the EEOC's "right to sue" letter, Kendall filed the present action in this court.

At trial, the witnesses' testimony was directed at resolving one contested issue: whether United could have reasonably accommodated Kendall's request for Fridays and Saturdays off during the month of July without violating the seniority system or incurring substantial costs. Captain Traynor, who was plaintiff's expert on contract interpretation and scheduling, said that it

could. Captain Volz, who was defendant's expert on those matters, said it could not. To resolve this conflicting testimony, we must focus more specifically on each on the five methods of accommodation which were potentially available to a pilot with a reserve schedule. Those methods were: 1) swapping days off with another pilot; 2) splitting multiple-day trips; 3) shifting days off by arrangement with the flight manager; 4) accepting an intracompany transfer; and 5) taking a leave of absence. With the exception of a leave of absence, each of these methods can be ruled out fairly easily.

United allowed its reserve pilots to swap days off with other reserves, but it was their responsibility to take the initiative in contacting other pilots who would voluntarily agree to a swap. (T. 42, 104, 152–53). Kendall rejected the swapping option as impracticable, because he did not think he could find enough people to swap every Friday and Saturday during the month. (T. 105). Volz agreed with that evaluation. (T. 152). Swapping, then, was simply not a feasible alternative.

The splitting of multiple-day trips was an option designed to mitigate the impact of having a fixed day off. United divided its flights into those lasting one, two, or three days. (T. 145). In July, 1972, 18% of the flights lasted one day, 62% lasted two days, and 20% lasted three days. (T. 146). Reserves with Fridays off would normally be unavailable for a three-day sequence beginning on Wednesday. (T. 146). Kendall suggested that he could substantially maintain his Friday availability by flying trips scheduled into that day, and then dropping only that segment of the trip which extended beyond sunset Friday. (T. 109–11). Captain Traynor testified that trip splitting was a permissible practice which occurred infrequently and which would not be likely to increase the *payroll* costs to the company. (T. 117, 123–26). However, Captain Volz testified that splitting not only ran afoul of the contract (§ 20–D–11) in most situations, but also depleted reserve manpower and increased both payroll and non-payroll costs to the company. (T. 184–85, 204). For

example, the company might be required to pay for a ticket for another airline to send the replacement pilot to the take-over point, and might also have to pay the pilot for the time when he "dead-headed" up to that location. (T. 185). We find Captain Volz's appraisal to be the more realistic one, and agree that splitting created considerable extra costs and reduced efficiency for United.

The method of accommodation which was most extensively considered in June, 1972 and which was most extensively debated at trial was shifting Kendall's days off from the middle of the week to the weekends. The company stated that such a procedure, as applied to Kendall's situation, would result in additional restrictions on reserve availability and would violate the seniority rights of other pilots. We agree with that assessment.

Kendall's request to shift all Fridays and Saturdays off during July would have given him a degree of inflexibility in his flight schedule which was greater than that enjoyed by other pilots. Under the 1970 contract, reserve pilots received ten days off, divided into one group of four days off and three groups of two days off. The four-day segment was "holy": that is, a reserve could not be called for duty in that period for any reason. However, the two-day segments were not holy. Under limited circumstances, a reserve could be scheduled into the first day of a two-day-off period if his trip began on a day of availability. (T. 63, 147). Because Kendall wanted both Fridays and Saturdays to be inviolate if the trips ran past sunset, he was in effect asking for a special exemption from reserve availability patterns. We agree with United that such an exemption would abnormally constrict his workweek and would reduce manpower efficiency. (T. 146–48).

The seniority issue was hotly disputed. Volz testified that Kendall's shifting request would have violated the seniority rights of other pilots, by artificially creating a new reserve line with Fridays and Saturdays off and by then awarding that line to Kendall outside of the seniority-

based bidding process established by the contract. (T. 153, 199). The Board of Adjustment agreed with Volz's contractual interpretation when it denied Kendall's grievance. However, Traynor insisted that no violation of seniority would have occurred. (T. 23–24, 52–53). He testified that the company was only changing the performance pattern of a schedule after it had been awarded, not awarding a completely new schedule outside the bidding process. He suggested that if United's argument were accepted, then all schedule modifications violated the rights of other pilots, because as soon as the company modified a schedule by one trip or one hour, it created a new work pattern that had never been available for bid by any pilot. (T. 119–122). The flaw in Traynor's critique is his statement that he saw no difference, in terms of contractual seniority rights, between changing one day off and changing every day off. (T. 122). We believe there comes a point at which the schedule changes are so pervasive or so fundamental that a new schedule is born. And at the end of the trial, Traynor himself admitted that Kendall's request to shift eight of his ten days off involved such a massive restructuring of his schedule that it was outside the scope of established methods for handling drops for personal reasons. (T. 227–229). He also admitted that he could not name one other pilot who had asked for every weekend off. (T. 223–24). Traynor's own suggested method of accommodation was to handle the weekends one at a time as they arose, not all at once in advance. (T. 228). We therefore find that, because of its unusual magnitude, Kendall's shifting request was in conflict with the seniority provisions of the collective bargaining agreement.

The fourth method of accommodation which was considered was an intracompany transfer to a position outside the pilot system. However, two considerations eliminated this method as a possible alternative. First, Kendall was firm in his desire to remain a pilot. Second, United was in the process of an economic retrenchment in all facets of its operations, so there were no other jobs available. (T. 151–52).

With swaps, shifts, splits and a transfer offering no hope for a reasonable accommodation, we turn to the possibility of a leave of absence. Kendall proposed that possibility at his August 10 hearing before Captain Treece and it was discussed at his June 28 meeting with Volz (Diary; T. 150) and ALPA's Wilsman had suggested it as a possible solution. (Diary). Because United's pilots could accrue seniority while on leave, Kendall suggested on August 10 that he go on leave until he accumulated enough seniority to bid the days off he needed.

Volz stated that he originally ruled out a leave of absence as a viable option because it would only delay Kendall's problem, not solve it. (T. 150–51, 158). He thought the low seniority problem would recur whenever Kendall was later promoted into a higher pilot status, because Kendall would then drop back down to the bottom of the seniority ladder in relation to that group of pilots. But Volz admitted on cross-examination that pilots could and have delayed their normal promotion sequence and increased their seniority strength in a lower classification. (T. 197). Traynor testified that pilots commonly used this technique of delay to assure a better choice of trip patterns and schedules. (T. 125–26). Volz also admitted that he did not recall whether Kendall concurred in his negative appraisal of a leave of absence. (T. 151). In the absence of any direct evidence on this issue, we find it unreasonable to infer, as Volz apparently did, that Kendall was unwilling to sacrifice a promotion for better scheduling. In his diary for June 28, Kendall wrote that "Mel said he realized I was willing to make every sacrifice I could." His diary also indicates that Kendall continued to believe in the viability of the leave of absence technique even after his June 28 discussion with Volz, when he raised that possibility at the hearing before Captain Treece. Volz confirmed at trial that Kendall strongly wanted to be a pilot and had "been working toward this career since I was in high school." (T. 151). Kendall also testified that he "was willing to abide by almost any accommodation . . . that would work." (T. 97). From all the

circumstances, we believe that Kendall saw a leave of absence as a viable option and that he valued continued employment as a pilot more than a normal progression through the ranks.

Volz also stated that a leave of absence was not feasible because it would have created significant costs for the company. On direct examination, he explained that pilots who are on leave from their schedules require "very minor" requalification after ninety-day absences, "more involved" requalification after six-month absences, and "complete retraining" after twelve-month absences. (T. 158). Complete retraining is "very expensive." (T. 159). However, on cross-examination, Volz effectively nullified his own statements by admitting that Kendall only had to requalify "very minimally" after his company occasioned economic one-year furlough from June, 1971 to June, 1972. He estimated that the retraining period lasted "not in excess of two days." (T. 195).

■ However, a leave of absence was not feasible unless Kendall could have expected that a sufficient cushion of more junior pilots would be hired in his domicile during his leave. According to Traynor, whose testimony on this subject was uncontradicted, Kendall only needed fifteen or twenty pilots below him to gain sufficient bidding power to get a reserve line with his Sabbath free. (T. 199, 132). It was very likely that any furloughed pilots who were recalled would, because of their low seniority, rejoin the company in one of the least desirable domiciles, which included Kendall's domicile of Chicago. (T. 133). Kendall was part of a group of 562 pilots who were furloughed in 1970 and 1971. He was one of a group of about 50 who were recalled in late 1971 and June 1972. Traynor testified that at the time of Kendall's June, 1972 discharge, the union was anticipating enough recalls within "a reasonable period of time" that Kendall would not have a problem. (T. 130–135). According to his somewhat uncertain memory, the next recalls after June of 1972

actually occurred in the first part of 1973. (T. 135). Volz testified that the recall process terminated with Kendall's group in June, 1972 and that United "had no additional plans for recall of furloughs in the foreseeable immediate future." (T. 166). He believed the next recalls were a group of fifteen or sixteen pilots in August, 1973.

We accept the company's recall forecasts as more reliable than the union's, since it could be expected to have superior access to information on its own personnel needs. But even using those forecasts, a leave of absence should not have been eliminated as a viable option. The "foreseeable immediate future" is unlikely to extend to the situation one year later, when the costs of retraining are still very minimal.[5] In addition, United introduced no evidence to show that giving Kendall a lengthy leave of absence would conflict in any way with the collective bargaining agreement or with the seniority rights of other pilots. Nor did it show that Kendall's work could not be performed by another employee of substantially similar qualifications during a leave or that using such a replacement would cause reduced efficiency, increased costs, or any other hardship. Finally, it did not demonstrate that a leave of absence was not a "reasonable" method of accommodation.

### Conclusions of Law

■ Plaintiff has established a *prima facie* case of religious discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2(a) and 2000e(j). He held, and continues to hold, a sincere belief in abstinence from work on his Sabbath, as required by a tenet of his religion. He timely informed his employer of both his religious beliefs and his need for an accommodation. He steadfastly maintained a cooperative attitude toward his employer in seeking a mutually acceptable resolution of his conflict. Finally, Kendall's observance of his Sabbath, and United's failure to accommodate that practice, was the sole basis for his discharge.

---

5. We attach little weight to the actual chronology of subsequent recalls, since those figures would only be the subject of pure speculation at the time of Kendall's discharge.

At this point, the burden shifted to United to "demonstrate that [it] is unable to reasonably accommodate to an employee's . . . religious observance or practice without undue hardship on the conduct of [its] business." *Redmond v. GAF Corporation*, 574 F.2d 897, 901 (7th Cir. 1978), *quoting* 42 U.S.C. § 2000e(j). United has failed to demonstrate, by a preponderance of the evidence, that granting Kendall a leave of absence would have caused an undue hardship to its business. The Supreme Court has stated that an employer incurs an "undue hardship" if it must bear more than a *de minimis* cost, in terms of lost efficiency or higher wages, or if it must violate its seniority system. *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977). Although United has met this test for the methods of splitting and shifting schedules, and has shown that swapping of days off and an intracompany transfer were simply not feasible under the circumstances, it has not satisfied this test for a leave of absence. The evidence established that method as an available, feasible and reasonable alternative. The evidence also shows that United never gave serious consideration to it as an accommodation although it was raised prior to Kendall's discharge and during the post-discharge grievance proceedings. We therefore conclude that United violated Title VII's bar on religious discrimination when it discharged Kendall for failing to report to work on his Sabbath.

■ At the outset of the trial, we acknowledged that defendant had raised a challenge to the constitutionality of Title VII's religious accommodation requirement. (T. 5–6). The parties agreed that we should reach that issue only if we first reached a factual determination under the statute in favor of the plaintiff. Now that we have satisfied that condition, the constitutional issue is squarely posed. Section 2403 of Title 28 requires that in any suit in which the constitutionality of any federal statute affecting the public interest is drawn in question, the court must certify that fact to the Attorney General, and permit the United States to intervene for presentation of evidence and for argument. We therefore direct the Clerk of the Court to mail a copy of this opinion forthwith to the United States Attorney for the Northern District of Illinois. The government is directed to file a statement of its position on the statute's constitutionality and on its desire to intervene by October 1, 1980. An appropriate briefing schedule for all the parties will be entered at a status hearing at 9:30 a. m. on October 15, 1980.