**Roy BARRON, individually, Plaintiff,**

v.

**SAFEWAY STORES, INC., a foreign corporation licensed to do business in Washington State, Defendant.**

**No. C–88–010–JLQ.**

United States District Court,
E.D. Washington.

Dec. 27, 1988.

Robert P. Kingsley, Spokane, Wash., for plaintiff.

Marcia Cavens, Bogle & Gates, Seattle, Wash., for defendant.

## ORDER DENYING MOTION FOR SUMMARY JUDGMENT

QUACKENBUSH, District Judge.

BEFORE THE COURT is Defendant's Motion for Summary Judgment (Ct.Rec. 27). A hearing was held on December 12, 1988. Plaintiff was represented by Robert Kingsley; Marcia Cavens appeared for defendant. Having reviewed the record, heard from counsel, and being fully advised in this matter, it is HEREBY ORDERED that defendant's motion for Summary Judgment SHALL BE DENIED.

## FACTUAL BACKGROUND

Roy Barron began working for Safeway Stores Distribution Center in Spokane as a general warehouseman in October 1969. The Distribution Center contains several separate operations, including grocery, at one end of the building, and salvage, at the other. These operations have their own regularly assigned work crews. Plaintiff's "regular assigned job" for the last 16–17 years was in the salvage warehouse. Only occasionally during his years of employment, prior to the fall of 1986, was he assigned outside of the salvage department to assist in grocery. These temporary grocery assignments occurred when changes in salvage operations resulted in temporary slack time.

When working in salvage, plaintiff's responsibilities included unloading pallets, damaged goods, returned cans, cardboard etc., from trucks returning from the retail stores, so that the trucks could be reloaded with merchandise. The pallets were stacked for reuse or repairs, the cans were crushed for shipment, and damaged merchandise was prepared for shipment to the re-hab center. Most of this work can be done with a forklift or pallet jack.

The primary work of the grocery department is to store and ship dry goods to the retail outlets. In this operation certain employees drive forklifts, which pick up pallets loaded by "pickers," and transport them to the loading dock to be loaded on trailers for delivery to retail stores. Other employees move up and down the aisles retrieving ordered merchandise from storage bins 4 feet wide by 4 feet high. This is known as "order selecting," or "picking," and entails reaching into the bins, grasping the merchandise, lifting it, and placing it on the floor on a pallet. It thus entails a substantial amount of lifting, bending or stooping, and twisting. Workers are required to move by hand 200 pieces per hour. Due to the physically demanding nature of the work it is not a popular assignment.

Several times during the years, when operations in salvage slowed down so that there was no work, the foreman would assign a salvage worker to the grocery warehouse to help out picking orders. Such a period occurred in 1986, when Safeway avoided a hostile take-over by means of a defensive buy-out. The Spokane Distribution Center was merged with Safeway's Seattle Division, raising the specter of closure of the Spokane Center should its continued operation not prove cost-effec-

tive. (Smith. Aff. at ¶ 3; Phelan Aff. at ¶ 9.) A number of changes resulted, which had the effect of reducing the salvage work performed, thereby freeing salvage workers for temporary assignment elsewhere. As a result, plaintiff and other salvage workers were assigned to grocery on a somewhat frequent basis from November 1986, through February 1987, when plaintiff's injury occurred. (Phelan Aff., Exh. 2; Ct.Rec. 34, Snodgrass dep., Exh. 8).[1]

In 1969, plaintiff suffered a work-related injury to his back, which necessitated back surgery (a lumbosacral fusion). Subsequent back injuries occurred in 1978, 1982, and 1987, the latter two of which occurred while plaintiff was on temporary assignment to the grocery warehouse selecting orders. At the time of the last injury on February 13, 1987, which precipitated this action, plaintiff was selecting orders in the dog food section of the grocery warehouse (Ct.Rec. 38).

On May 12, 1987, plaintiff met with Safeway management personnel Jeff Phelan, Stan Snodgrass and Floyd Mattern to discuss his return to work (Ct.Rec. 34, Barron Aff. at ¶ 8). At that meeting he told them that he was ready to return to work immediately, but only in salvage. He refused to continue selecting orders. He also wanted the swing shift salvage job held by Larry Ferderer. He did not have a doctor's release to return to work (Ct.Rec. 29, Barron dep. at 53).[2] Safeway refused, on the basis that (1) he did not have the unconditional doctor's release required by the collective bargaining agreement; (2) his previous job had been a day shift job and he was de-manding a swing shift job held by someone else; (3) his previous job entailed order selecting as an essential, albeit occasional, function, and he refused to continue performing that duty; and (4) Safeway was unwilling to further restrict its flexibility in making work assignments, beyond the scope of the provisions of the collective bargaining agreement (Phelan Aff. at ¶ 13). In response, plaintiff advised Safeway that he intended to file a grievance with his union. He did so on May 27, 1987.

Plaintiff's grievance claimed that he had a contract right to displace the swing shift salvage worker under Article 6.1.5 of the collective bargaining agreement, since he had greater seniority (Ct.Rec. 29, Exh. 3). Safeway's position was that Article 6.1.5 covered bid jobs only, and that the salvage job was not a bid job. (Phelan Aff. ¶ 16; Exh. 1 at 6.) The position of plaintiff's union representative was that, although the salvage job was not a "bid job" under the collective bargaining agreement, plaintiff had a right to bump Larry Ferderer because of his higher seniority (Barrick dep. at 49).

A grievance meeting was held on September 28, 1987. Although plaintiff had told Safeway that he was ready to return to work, his doctor, Dr. Lester, had stated that he would not be able to return to his former job, if that entailed selecting orders.[3] (Phelan Aff. at ¶ 19; Exh. 4, 5, and 6). A panel of independent orthopedic specialists had examined plaintiff and had placed weight lifting restrictions on his work (Phelan Aff. at ¶ 20; Exh. 7). At the grievance meeting it was agreed by all participants, including the Union, that

---

**1.** The grocery warehouse has a separate punch clock for picking (Ct.Rec. 34, Snodgrass dep. at 16), although temporary workers do not always utilize it. Plaintiff admits that he picked on a more frequent basis than that shown on Exhibit 2. (Ct.Rec. 29, Barron dep. at 82, 85).

**2.** Dr. Lester's May 15, 1987 letter to Scott Wetzel Services, Inc. indicated that plaintiff was still suffering from "some significant aching discomfort across the area just at the upper level of his fusion and off to the left of the midline." Dr. Lester also stated that plaintiff "feels, and I agree, that he could not/should not return to work, doing the type of warehouse work that he was doing in the past.... I believe that he should find lighter work." (Ct.Rec. 29, Exh. 4)

**3.** Dr. Lester's July 17, 1987 letter stated:

"It is Mr. Barron's opinion, based upon his knowledge of the job, and it is my opinion, based upon the historical experience of his being able to tolerate the first job [salvage], that he would be able to return to work in the first position. I do not, however, think that he could or should do the second position [picking orders] now or in the future, based upon the known situation with his lower back." (Ct.Rec. 29, Exh. 5)

plaintiff's contract issues could not be resolved without clearer medical information, and it was determined that Dr. Lester should be provided with the same evaluation form prepared by the panel (Phelan Aff. at ¶ 22, Barron dep. at 158–59). Dr. Lester's subsequent completion of that form indicated that plaintiff could lift the weights necessary to perform both the salvage job and occasional order selecting. In his accompanying letter, however, Dr. Lester stated that plaintiff could not lift weights between 51 and 100 pounds as a "regular repetitive function of his work associated with twisting." (Ct.Rec. 29, Exh. 6). Plaintiff later withdrew his grievance and filed this action in state court, alleging unlawful discrimination based on handicap, and failure to make reasonable accommodation for an employee's handicap. Defendant had the case removed to federal court on the basis of diversity of citizenship.

Safeway alleges that it encountered some difficulty in accommodating Mr. Barron's handicap, since almost all warehouse jobs include order selecting or other substantial amounts of lifting (Smith Affidavit, Ct.Rec. 29). After discussions between George M. Smith, H.O. "Red" Davis, and Jeff Phelan, Safeway offered plaintiff two possible jobs. It consented to plaintiff's demand for the swing shift position in salvage, subject to clocking out rather than transferring to order selecting if there was no work in salvage. The other job was for general assignment to the "general order selecting pool." [4] Safeway's "best estimate" was that Mr. Barron might be required to clock out for up to 4 hours per week for either job.

It is unclear from the affidavits and depositions offered precisely when the clocking-out offer was first made. Some of the testimony indicates that it was first suggested at the September 28 grievance meeting,[5] but was rejected by the Union representative for failure to comply with the 40–hour requirement (Smith Affidavit, Ct. Rec. 29). It is clear that the offer was made in writing no later than February 19, 1988 (Ct.Rec. 29, Exh. 10).

Although his union withdrew its objection to the possibly less than 40–hour week proposals (Ct.Rec. 29, Exh. 11), plaintiff rejected that offer, based on his assertion that the collective bargaining agreement entitled him, as a "full-time" employee, to a guaranteed 40 hours of work per week.[6] Defendant alleges that, prior to the accident, although plaintiff was entitled to work 40 hours, by his own choice he rarely did so. Although records for 1980 and prior years, and for 1982 through 1986 were unavailable, having been shipped to Seattle at the time of the merger, records for 1981 were inadvertently left in Spo-

---

**4.** In its February 19, 1988 letter to Mr. Barron and his Union, Safeway stated that, although the second job was to the "general order selecting pool," his relative seniority would place him at or near the top of the list, and, despite its title, the job would afford him the "opportunity to work almost continuously in a variety of less strenuous warehouse jobs as a substitute for absent employees and as an extra person to help when and where needed." However, this job also entailed some order selecting. (Ct.Rec. 29, Exh. 10).

**5.** Smith stated that the clock-out option was raised at the grievance meeting. (Smith Aff. ¶ 6). Union representative Barrick denied that there was any discussion of job options for Mr. Barron or mention of clocking out. (Ct.Rec. 34, Barrick Aff. at ¶ 6). Barron stated in his deposition that he does not remember whether it was raised at that meeting, but that there was no job offer actually made at that meeting. (Barron dep. at 181–82). However, in his affidavit (Ct.

Rec. 34) he unequivocally stated that there was no mention made by Safeway representatives at that meeting of a clocking out option. Barron admits having discussed the clock-out option with his union representative prior to commencing this lawsuit, but does not remember precisely when. (Barron dep. at 183). This suit was commenced in state court on December 10, 1987. However, he then stated, in his affidavit, that his "first awareness of any offer by Safeway to accommodate my handicap by allowing me to clock out rather than perform order selecting occurred as a result of a January 13, 1988 letter to my attorney." (Ct.Rec. 34, Barron Aff. at ¶ 11).

**6.** Plaintiff stated in his deposition that he rejected the offer of a 36 to 40 hour work week because: "What is wrong with it, the thing that is wrong with it as far as I am concerned is I am guaranteed a 40–hour work week. I am guaranteed that by my union contract, and I intend to keep that right." (Barron dep. at 208).

kane. These records show that plaintiff elected to take 116.9 hours of unpaid personal leave (this does not include sick time, vacation time, etc.), with an average work week of 37.7 hours. In 1986, plaintiff took 282.5 hours of unpaid personal leave, working an average 34.6 hours per week. In the 6 weeks worked in 1987 prior to his accident, plaintiff took 24.3 hours of personal leave, working an average of 36.1 hours (Ct.Rec. 36).

Plaintiff responds that the Snodgrass affidavit computing personal leave hours taken does not include all of the hours that he worked in 1981. He alleges that he recalls numerous occasions when he worked in excess of 40 hours per week. He also alleges that the computation does not account for the holidays that he worked. Plaintiff then advises the court that during 1986 and 1987 his father died and he used personal time to assist his mother with her affairs, and to care for her during her terminal illness. Again he alleges that the hours listed in the Snodgrass affidavit for these later years do not include hours worked in excess of 40 per week or holidays worked.

In addition to objecting to a less than 40-hour work week, plaintiff insisted that Safeway assign him to non-order selecting jobs during the hours when salvage did not need him. He asserted that he had a right, due to his salvage department seniority, to displace grocery workers temporarily assigned to grocery jobs which were not their regular assignments. For example, if a grocery worker who was not regularly assigned to drive forklifts was so assigned on a particular morning when salvage was caught up, plaintiff asserted that he had the right to bump the temporary forklift driver and take his place (Barron dep. at 197–200). Safeway objected on numerous grounds. It felt that such a course would unduly restrict its flexibility in assigning jobs; it would impair grocery workers' morale, since such temporary assignments away from order selecting were morale boosters; it would impair efficiency, since it could result in a chain of bumpings as succeeding grocery workers would seek to bump less senior workers from less strenu-

ous jobs, and could result in jobs being only half-completed due to confusion over who was responsible for completing the job should the salvage worker be recalled; and it would result in an increased safety risk, since non-order selecting jobs were awarded to relieve fatigue. (Ct.Rec. 29, Phelan Aff.)

Plaintiff's complaint also alleges that, prior to his accident, Safeway "overlooked other qualified employees for this transfer [to grocery order selecting], all of whom had less seniority than the Plaintiff." (Ct. Rec. 1, ¶ 2.7). He complains that Safeway did not "give my seniority or my disability any consideration whenever I was taken out of salvage to pick orders." (Ct.Rec. 29, Barron dep. at 6, 24, 25). It was his position that Larry Ferderer, the junior salvage worker, should replace him in grocery when he came on at 11:00. Plaintiff admits that Safeway agreed to accommodate that request, and did in fact usually send Larry Ferderer to replace him. (Barron dep. at 26, 28). However, he complains that, once he arrived in grocery, his seniority was not upheld (Barron dep. at 30–34). Plaintiff also alleges that Safeway misrepresented the swing shift salvage position offered to him as necessitating up to 4 hours per week in order selecting. He asserts that there are now only two salvage workers, one day shift, and one swing shift, and that the salvage warehouse is never left without someone present.

## ANALYSIS

### SUMMARY JUDGMENT

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court. *Zweig v. Hearst Corp.*, 521 F.2d 1129 (9th Cir.), *cert. denied*, 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975). The moving party is entitled to judgment as a matter of law where, viewing the evidence and the inferences arising therefrom in favor of the nonmovant, there are no genuine issues of material fact in dispute. Fed.R.Civ.P. 56(c); *Semegen v. Weidner*, 780 F.2d 727 (9th Cir.1985). However, summary judg-

ment is appropriate only where reasonable minds could not differ on the material facts at issue. *See v. Durang,* 711 F.2d 141 (9th Cir.1983).

In *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), the Supreme Court stated that when the moving party has carried its burden under Rule 56(c) "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586, 106 S.Ct. at 1356. "[I]f the factual context renders respondents' claim implausible ... respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary." *Id.* at 587, 106 S.Ct. at 1356.

In *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) and *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Supreme Court further examined summary judgment analysis. In *Anderson,* the Court held that in ruling on a motion for summary judgment the court "must view the evidence presented through the prism of the substantive evidentiary burden," 477 U.S. at 254, 106 S.Ct. at 2513, i.e., it must apply the standard of proof pertinent to the type of case before the court in reaching a decision whether summary judgment is proper. *Id.* at 255, 106 S.Ct. at 2513. *Celotex* clarified the burden that the parties must meet to succeed in, or withstand a motion for summary judgment.

In evaluating the appropriateness of summary judgment under these recent decisions, three steps are necessary: (1) determination of whether a fact is material; (2) determination of whether there is a genuine issue for the trier of fact, as determined by the documents submitted to the court; and (3) consideration of that evidence in light of the appropriate standard of proof. As to materiality, the applicable substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude entry of summary judgment. Factual disputes which are irrelevant or unnecessary to the outcome are not counted. *Anderson, supra* 477 U.S. at 248, 106 S.Ct. at 2510. Where there is a complete failure of proof concerning an essential element of the nonmoving party's case, all other facts are rendered immaterial, and the moving party is entitled to judgment as a matter of law *Celotex, supra* 477 U.S. at 323, 106 S.Ct. at 2553.

Given that a fact is material, summary judgment will not lie if the dispute about that fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson, supra* 477 U.S. at 248, 106 S.Ct. at 2510. In essence, the inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury, or whether it is so one-sided that one party must prevail as a matter of law. *Id.* at 251–252, 106 S.Ct. at 2512. If reasonable minds could differ as to the import of the evidence, summary judgment should not lie. *Id.* at 250–51, 106 S.Ct. at 2511.

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of any genuine issue of material fact. *Celotex, supra* 477 U.S. at 323, 106 S.Ct. at 2553. Where the moving party has met its initial burden with a properly supported motion, the party opposing the motion "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial," *Anderson, supra* 477 U.S. at 248, 106 S.Ct. at 2510, quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). This does not, however, mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment. *Celotex, supra* 477 U.S. at 324, 106 S.Ct. at 2553.

Although the *Anderson* court stated that at the summary judgment stage the

judge's function is to determine whether there is a genuine issue for trial, and is not himself to weigh the evidence and determine the truth of the matter, it also stated that if the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson, supra* 477 U.S. at 249–50, 106 S.Ct. at 2511. It went on to state that when determining whether a genuine factual issue exists, the trial judge "must bear in mind the actual quantum and quality of proof necessary to support liability." *Id.* at 254, 106 S.Ct. at 2513. This necessitates application of the substantive evidentiary standard of proof that would apply at the trial on the merits. *Id.* at 252, 106 S.Ct. at 2512. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict." *Id.*

The Ninth Circuit has interpreted the *Celotex* trilogy cases as being more restrictive than would first appear. In examining the evidence offered by the nonmoving party, the court must distinguish between direct evidence and indirect or circumstantial evidence. Where there is conflicting direct evidence concerning a material fact, a question of credibility arises, which is a question for the trier of fact, and is therefore not appropriately disposed of by summary judgment. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630–632 (9th Cir.1987). In such cases the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. *Id.* at 631. It

may not weigh against it any conflicting evidence presented by the moving party.

Where the only evidence offered in opposition to the motion for summary judgment is circumstantial evidence, then the court may inquire into the plausibility of the inferences drawn from that evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1207 (9th Cir.1988). But the *Matsushita* "implausibility" standard is appropriate only in such instances. *Id.*

Where both direct and circumstantial evidence are offered in opposition to the motion, "the court's ultimate inquiry is to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence." *T.W. Elec., supra* at 631. Inferences from the nonmoving party's "specific facts" as to other material facts may only be drawn if they are reasonable in view of other undisputed background or contextual facts and only if such inferences are otherwise permissible under the governing substantive law. *Id.* at 631–32. "This inquiry ensures that a 'genuine' issue of material fact exists for the factfinder to resolve at trial." *Id.* at 632.

PREEMPTION

The basis upon which this case was removed to federal court was diversity of citizenship.[7] Plaintiff asserts rights under state law to be free from discrimination on the basis of his status as a handicapped individual. Before evaluating the merits of plaintiff's claim, this court must determine whether evaluation of that claim under state anti-discrimination law is preempted by federal labor law. The Ninth Circuit, summarizing § 301[8] preemption analysis,

---

7. There is no federal question jurisdiction in this case because, by withdrawal of his grievance, plaintiff failed to exhaust his administrative remedies, a mandatory prerequisite to a suit to enforce a collective bargaining agreement under § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185. *See Clayton v. Automobile Workers*, 451 U.S. 679, 685, 101 S.Ct. 2088, 2093, 68 L.Ed.2d 538 (1981).

8. § 301 of the Labor Management Relations Act of 1947, 61 Stat. 156, 29 U.S.C. § 185, provides:

"(a) Venue, amount, and citizenship. Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Act, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."

has identified the Supreme Court's "twin tests":

> Does the application of state law "require[ ] the interpretation of a collective-bargaining agreement," *Lingle [v. Norge Div. of Magic Chef, Inc.]*, —— U.S. ——, 108 S.Ct. [1877] at 1885 [100 L.Ed.2d 410 (1988)] or "substantially depend[ ] upon analysis of the terms of an agreement made between the parties in a labor contract?" *Allis–Chalmers [Corporation v. Lueck]*, 471 U.S. [202] at 220 [105 S.Ct. 1904, 1916, 85 L.Ed.2d 206 (1985)].

*Newberry v. Pacific Racing Ass'n*, 854 F.2d 1142, 1147 (9th Cir.1988). In *Lingle v. Norge Div. of Magic Chef, Inc.*, —— U.S. ——, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988), the Supreme Court stated that:

> if the resolution of a state-law claim depends upon the meaning of a collective-bargaining agreement, the application of state law (which might lead to inconsistent results since there could be as many state-law principles as there are States) is pre-empted and federal labor-law principles—necessarily uniform throughout the nation—must be employed to resolve the dispute.

*Id.* 108 S.Ct. at 1881.[9] It went on to find that:

> the state-law remedy in this case is "independent" of the collective-bargaining agreement in the sense of "independent" that matters for § 301 preemption purposes: resolution of the state-law claim does not require construing the collective-bargaining agreement.

*Id.* at 1882. Thus, it is clear that the state claim is preempted only when resolution of the discrimination claim involves interpretation of the language of the collective bargaining agreement. *Id.* at 1885.

The Supreme Court, in *Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985), enunciated the policies underlying the preemption doctrine in these situations:

> These policies require that "the relationships created by [a collective bargaining agreement]" be defined by application of "an evolving federal common law grounded in national labor policy." (cite omitted). The interests in interpretive uniformity and predictability that require that labor-contract disputes be resolved by reference to federal law also require that the meaning given a contract phrase or term be subject to uniform federal interpretation. Thus, questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law, whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort.

*Id.* at 210–11, 105 S.Ct. at 1911.

 It is equally clear that § 301 and the pre-emption doctrine do not grant the parties to a collective bargaining agreement the ability to contract for what is illegal under state law. It "would be inconsistent with congressional intent under [§ 301] to pre-empt state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract." *Id.* at 212, 105 S.Ct. at 1912. Therefore, when a state-law right or obligation exists independently of private agreements, those "nonnegotiable" rights or obligations cannot be waived by the parties. Suits involving such rights are not preempted. *Id.* at 213, 105 S.Ct. at 1912; *Miller v. AT & T Network Sys.*, 850 F.2d 543, 546 (9th Cir. 1988). A right is "nonnegotiable" if state law does not permit it to be waived, alienated, or altered by private agreement. *Miller*, at 546. It is plaintiff's position that his state-law right to be free from discrimi-

---

9. In *Lingle* the court held that resolution of the dispute did not require examination of the collective bargaining agreement, because plaintiff's claim, alleging retaliatory discharge, required a showing that the employee was discharged and that the employer's motive was to deter him from exercising his rights under the worker's compensation laws. Neither element required examination of the collective bargaining agreement's terms. Likewise, the elements necessary for the employer's defense were limited to its motive, which was likewise a pure question of state law.

nation due to his handicap is such a nonnegotiable, independent right.

Plaintiff relies on *Reese v. Sears, Roebuck & Co.*, 107 Wash.2d 563, 731 P.2d 497 (1987), the most recent Washington Supreme Court decision on this issue, to support his assertion that any claim of handicap discrimination under RCW ch. 49.60 is not preempted, since the right to be free from discrimination is a statutory right which cannot be waived. In *Reese*, defendant argued that plaintiff's claim was strictly contractual in nature, arising out of defendant's alleged failure to honor the bargaining agreement's leave of absence provision. Therefore, it argued, plaintiff's exclusive remedy was the grievance procedure called for in the agreement. The court disagreed, and characterized his claim as a right to reemployment abridged by defendant's refusal to reasonably accommodate his handicap, in violation of RCW ch. 49.60. The court identified this as a "statutory civil right, rather than a contractual one." *Id.* at 575, 731 P.2d 497. Finding that "[a]rbitral procedures, while well suited for resolving contractual disputes, are not appropriate for resolving civil rights disputes," the court held that "the comprehensive statutory scheme contained in RCW 49.60 evidences the Legislature's intent to allow individual employees to pursue their statutory rights independently from the remedies of a collective bargaining agreement." *Id.* at 577, 731 P.2d 497.

The *Reese* analysis falls before the subsequent Supreme Court decision in *Lingle*, where the Supreme Court again stated that the state law claim only avoids preemption where the state claim can be resolved without interpreting the collective bargaining agreement. *Lingle*, 108 S.Ct. at 1883. In addition, *Reese* is distinguishable. The Washington Supreme Court decision focused on whether the presence of an exclusive remedies provision in the collective bargaining agreement barred an action to assert a civil right, in light of Washington's repeal of its election of remedies statute. The court never addressed the preemption issue.

■ The primary issue before this court is whether defendant offered plaintiff a reasonable accommodation for his handicap. In *Allis–Chalmers, supra*, 471 U.S. at 218, 105 S.Ct. at 1915, the court found that under Wisconsin law the parties to an insurance contract were free to bargain about what "reasonable" performance of their contract obligation entailed. Because the plaintiff's claim of bad-faith refusal to honor the insured's claim derived from the contract, and was defined by the contractual obligation of good faith, the court held that a determination of liability would inevitably involve contract interpretation. The court went on to state that if claims involving vacation or overtime pay, work assignment or unfair discharge could be brought in the first instance in state court by a complaint in tort rather than in contract, such a rule would cause arbitration to lose most of its effectiveness, and would "eviscerate a central tenet of federal labor-contract law under § 301 that it is the arbitrator, not the court, who has the responsibility to interpret the labor contract in the first instance." *Id.* at 219–20, 105 S.Ct. at 1915–16.

The *Allis–Chalmers* analysis is particularly applicable in the case now before the court, where plaintiff alleges that defendant did not "reasonably" accommodate his handicap. Such a determination necessitates an examination of the conflicting rights of plaintiff and other employees of Safeway, as established by the collective bargaining agreement and/or company practice. Such company practice has been held to be an element of the analysis under the collective bargaining agreement and to therefore be appropriately addressed through the grievance procedures established by the agreement.[10] However, that

---

10. In *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960) the Supreme Court held that "the labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law—the practices of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it." *Id.* at 581–82, 80 S.Ct. at 1352. The arbitrator's judgment on a

is not to say that an examination of past company practice requires construction of the collective bargaining agreement, so as to mandate preemption.

In *Miller* the Ninth Circuit stated that: [i]n deciding whether a state law is preempted under section 301 ... a court must consider: (1) whether the CBA contains provisions that govern the actions giving rise to a state claim, and if so, (2) whether the state has articulated a standard sufficiently clear that the state claim can be evaluated without considering the overlapping provisions of the CBA, and (3) whether the state has shown an intent not to allow its prohibition to be altered or removed by private contract. A state law will be preempted only if the answer to the first question is "yes," and the answer to either the second or third is "no."

*Miller, supra,* 850 F.2d at 548. In the instant case, the court is unwilling to answer the first question affirmatively at this time. Although the collective bargaining agreement governs the rights of Safeway employees to their jobs, and the nature and extent of their seniority rights, it is not absolutely clear that interpretation of that agreement will be necessary for a resolution of plaintiff's claims. Although plaintiff's complaint relies specifically on Articles 5 and 6.1.5 in support of his seniority claims, he also argues that those rights exist independently of the collective bargaining agreement. While any accommodation made to plaintiff which affects other worker's rights under that agreement must be evaluated by examining the terms of the agreement and company practice, "interpretation" of the collective bargaining agreement's terms may not be necessary should the court find, at trial, that there was "available" a full-time salvage job or that the scope of employees' seniority rights can be determined without "interpreting" the CBA. Safeway conceded the seniority issue with regard to Mr. Ferderer

when it made Mr. Barron the offer of the swing-shift position.

As for the second and third *Miller* queries, Washington has neither enunciated a clear standard for evaluating the reasonableness of an employer's accommodation, nor shown an intent not to allow the definition of what constitutes a "reasonable accommodation" to be bargained for. While plaintiff's right to reasonable accommodation is clearly a state-created right, what constitutes reasonableness is not so explicitly addressed by the Washington legislature. In fact, the Washington Administrative Code expressly states that "other laws and contracts" may be considered in determining whether the cost of accommodating the handicap creates an undue hardship. Violation of third parties' rights under their collective bargaining agreement is an issue which should be considered in determining the reasonableness of Safeway's proffered accommodation. Plaintiff's claim is that he had a right, under that agreement, or because of company practice recognizing seniority, to bump other employees in grocery should he be temporarily assigned there. He also claimed that he had a right to bump the swing-shift salvage worker and take his place.

The *Miller* court stated that when a court is faced with deciding whether an employer acted reasonably, "the possibility that the CBA permitted the employer's behavior would strongly support the claim of reasonableness." *Id.* at 549. The converse is equally true—where the collective bargaining agreement precludes granting an employee's demanded accommodation, where such an award would be at the expense of other employees' rights under the agreement, the employer's refusal to acquiesce in the demand should likewise be found to be reasonable. Whether that occurred in this case may necessitate an examination of the agreement and the rights created thereunder. However, this court is not willing, at this time, based upon the documents submitted to it in support of

particular grievance "will reflect not only what the contract says but, insofar as the collective bargaining agreement permits, such factors as the effect upon productivity of a particular re-

sult, its consequences to the morale of the shop, his judgment whether tensions will be heightened or diminished." *Id.* at 582, 80 S.Ct. at 1353.

this motion, to declare that interpretation of the terms of the collective bargaining agreement is necessary for a resolution of this matter. Should it become evident during trial that interpretation of those terms is required, then the preemption doctrine will call for dismissal at that time.

## THE MERITS—WASHINGTON'S ANTI-DISCRIMINATION ACT

■ Defendant asks the court to hold that Safeway's offered accommodation was "reasonable" as a matter of law, and therefore grant its motion for summary judgment of dismissal. Although reasonableness is generally a question of fact, and is thus not appropriately disposed of by summary judgment in most instances, under the *Celotex* trilogy summary judgment may be proper where plaintiff, the nonmoving party, completely fails to come forward with evidence to refute evidence submitted by the moving party to show that the accommodation offered was reasonable.

RCW 49.60.180 makes it an unfair practice for any employer to refuse to hire or to discharge any person from employment because of the presence of any sensory, mental, or physical handicap. Subsection (1), covering refusals to hire, contains a proviso that the prohibition against discrimination because of the handicap shall not apply if the particular disability prevents the proper performance of the particular work involved. Although subsection (2), covering discharges, does not contain the proviso, the Washington Administrative Code states that the proviso applies to "all circumstances where ability to do the job is material." WAC 162–22–050(3). Therefore, two things must occur before an unfair practice is committed: the employer must have refused to hire or otherwise discriminated *because* the person has a handicap, and the handicap must not be of a nature which

prevents the person from properly performing the particular job. WAC 162–22–050(2); *Clarke v. Shoreline School Dist.*, 106 Wash.2d 102, 720 P.2d 793 (1986).

The Washington Administrative Code also requires that employers make "reasonable accommodation" for their employee's handicaps, unless such accommodation would impose an undue hardship.[11] Factors considered in determining whether the necessary accommodation creates an undue hardship include the size of the employer's business and the value of the employee's work, as well as "the requirements of other laws and contracts."[12] WAC 162–22–080. Thus, an employer's contractual responsibilities to other workers should be considered in determining whether the accommodation is reasonable.

A handicapped employee makes out a prima facie case of handicap discrimination if he proves: (1) that he . . . is handicapped, (2) that he . . . had the qualification required to fill vacant positions, and (3) that the employer failed to take affirmative measures to make known such job opportunities to the employee and to determine whether the employee was in fact qualified for those positions. *Dean v. Metropolitan Seattle*, 104 Wash.2d 627, 639, 708 P.2d 393 (1985). Although the actual extent of plaintiff's "handicap" is still somewhat unclear, for the purpose of this summary judgment motion as well as the offer previously made plaintiff by Safeway, Safeway assumes that his handicap legitimately prevents him from doing order selecting. Therefore, any dispute regarding the extent of his disability is not material.

The second element of a prima facie case is whether plaintiff had (1) the qualifications required to fill (2) a vacant position. Safeway asserts that he was not qualified to return to his former job. The heart of

---

**11.** WAC 162–22–080 provides in part:
"(1) It is an unfair practice for an employer to fail or refuse to make reasonable accommodations to the sensory, mental, or physical limitations of employees, unless the employer can demonstrate that such an accommodation would impose an undue hardship on the conduct of the employer's business."

**12.** WAC 162–22–080(3) provides:

"The cost of accommodating an able handicapped worker will be considered to be an undue hardship on the conduct of the employer's business only if it is unreasonably high in view of the size of the employer's business, the value of the employee's work, whether the cost can be included in planned remodeling or maintenance, the requirements of other laws and contracts, and other appropriate considerations."

plaintiff's argument is his claim that order selecting was not an essential function of his job with Safeway, because it was not a regular, everyday assignment. At the least, he argues, the court should find that whether it was an essential element of the job is a material fact in dispute which should not be determined by summary judgment.

The Supreme Court, in evaluating a claim under § 504 of the federal antidiscrimination act, has held that "an otherwise qualified [handicapped] person is one who is able to meet *all of a program's requirements* in spite of his handicap." *Southeastern Community College v. Davis*, 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed. 2d 980 (1979). (Emphasis added). It is undisputed that plaintiff and other salvage workers had been assigned to order selecting on numerous occasions in the past. It is also undisputed that Safeway's operations changed substantially in 1986, including elimination of the can crushing operation which previously consumed up to 20 man-hours per week. The result was an increase in assignments of salvage workers to grocery order selecting. Plaintiff's job carried no guarantee that he would not be assigned out of salvage, and past business practice evidences that he was so assigned. However, whether, at the time Safeway offered plaintiff the clocking-out option, order selecting was an essential element of the salvage job is in dispute. Plaintiff offers as indirect evidence supporting his claim the fact that the salvage staff has been reduced to only two workers, one day shift, and one swing shift, and Mr. Snodgrass's deposition testimony that salvage has never, to his knowledge, run completely out of work.

The Eleventh Circuit, in *Treadwell v. Alexander*, 707 F.2d 473 (11th Cir.1983), addressed a similar situation, when it examined an employer's job qualification criteria to determine whether the applicant could perform the essentials of the job sought.[13] The court held that "[t]he essential nature of a particular job function is not determined *solely* by the amount of time devoted to it. [The fact that] a technician might be called upon to operate a motorboat alone only occasionally does not make that job function any less essential or make it unrelated to the job." *Id.* at 477. (Emphasis in original).

It is thus evident that the question whether order selecting was an essential element of the swing shift salvage job, at the time Safeway made its offer, is a material fact in dispute.

Assuming that plaintiff's handicap did not prevent him from doing salvage work itself, Safeway asserts that it did not have a "vacant position" in salvage for which it could guarantee plaintiff 40–hours work per week. The evidence submitted by Safeway shows that periodically during the last 2 years salvage workers have been assigned to order selecting, although these hours did not rise to the predicted 3 or 4 hours per week.[14] No evidence has been offered by plaintiff of specific vacancies. Rather, the focus is on whether other employees could be bumped to create such a position. Safeway was unwilling to guarantee plaintiff that it would allow him to bump other qualified workers in grocery from their positions whenever salvage had no work. The law does not require Safeway to create a job for a handicapped applicant, or to hire him in preference to a more qualified employee. *Clarke v. Shoreline School Dist.*, 106 Wash.2d 102, 121, 720

---

**13.** In *Treadwell* the applicant had a heart condition. He was seeking a position with the Corps of Engineers as a seasonal park technician. The job criteria required an applicant to be able to operate a motorboat alone, and to walk a great deal over rough terrain. The applicant's heart condition precluded both tasks. He wanted the employer to allow him to be assigned solely to fee collection, or to assign additional personnel to accompany him when he operated a motor launch.

**14.** Safeway offered direct evidence of the hours Mr. Ferderer worked "picking" orders from August, 1987 through March 1988. This shows that Mr. Ferderer worked picking orders on five occasions in August, 1987, for a total of 8 hours; on three occasions in September, for a total of 5.25 hours, twice in October, totaling 5.25 hours, twice in November, totaling 3.5 hours, three times in December, totaling 4.25 hours, four times in January, 1988, totaling 2.5 hours, and six times in February, totaling 6.75 hours.

P.2d 793 (1986). A Supreme Court case involving Title VII is helpful in evaluating the reasonableness of Safeway's position on the seniority bumping issue. In *Ford Motor Co. v. Equal Employment Opportunity Comm'n*, 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982), the court stated:

> [Title VII] permits us to consider the rights of "innocent third parties." [citation omitted]. The lower court's rule places a particularly onerous burden on the innocent employees of an employer charged with discrimination. Under the court's rule, [that an unconditional offer of the job sought, but without retroactive seniority, does not toll liability for backpay] an employer may cap backpay liability only by forcing his incumbent employees to yield seniority to a person who has not proved, and may never prove, unlawful discrimination. As we have acknowledged on numerous occasions, seniority plays a central role in allocating benefits and burdens among employees. In light of the "overriding importance" of these rights, [citations omitted], we should be wary of any rule that encourages job offers that compel innocent workers to sacrifice their seniority to a person who has only claimed, but not yet proved, unlawful discrimination.

*Id.* at 239–40, 102 S.Ct. at 3069–70.

The third element of a prima facie case of discrimination is whether the employer failed to take affirmative measures to make known job opportunities and to determine whether the employee was in fact qualified for those positions. This element also requires an employer to take affirmative steps to help the handicapped employee fill the vacant position, and encompasses the "reasonable accommodation" requirement. The evidence offered the court supports a finding that Safeway took affirmative steps to determine whether it had any warehouse jobs which it could offer plaintiff which did not entail any possibility of assignment to order selecting. However, Safeway did not offer evidence as to the extent of that effort. The evidence is also undisputed that Safeway offered plaintiff the clocking-out option as an alternative to

order selecting assignments, although precisely when that offer was first made is disputed. It is also undisputed that Safeway had plaintiff's physical condition evaluated by a panel of doctors, and requested plaintiff's own doctor to complete an identical evaluation form in an attempt to determine the extent of his handicap.

As to whether plaintiff's offer was a reasonable accommodation, Federal antidiscrimination law is helpful. When Washington statutes, such as the antidiscrimination law, have the same purpose as their federal counterparts, Washington courts look to federal decisions to determine the appropriate construction. *Clarke, supra*, 106 Wash.2d at 118, 720 P.2d 793. Federal regulations identify examples of reasonable accommodations for handicapped applicants or employees as including "job restructuring, *part-time or modified work schedules.*" 29 C.F.R. 1613.704 (emphasis added).

Neither federal law nor state law requires an employer to offer the applicant or employee the precise accommodation that he requests. *Ansonia Bd. of Education v. Philbrook*, 479 U.S. 60, 68, 107 S.Ct. 367, 372, 93 L.Ed.2d 305 (1986); *American Postal Workers Union v. Postmaster General*, 781 F.2d 772, 775 (9th Cir.1986); *Clark, supra*, 106 Wash.2d at 119, 720 P.2d 793. Although the *Ansonia* case dealt with religious accommodation, its rationale is equally applicable in a handicap discrimination case, where the statutory language is similar. The court stated:

> We find no basis in either the statute [42 U.S.C. § 2000e(j) ] or its legislative history for requiring an employer to choose any particular reasonable accommodation. By its very terms the statute directs that any reasonable accommodation by the employer is sufficient to meet its accommodation obligation.... [W]here the employer has already reasonably accommodated the employee's religious needs, the statutory inquiry is at an end. The employer need not further show that each of the employee's alternative accommodations would result in undue hardship.... [T]he extent of undue hardship

on the employer's business is at issue only where the employer claims that it is unable to offer any reasonable accommodation without such hardship.

*Id.* 479 U.S. at 68–69, 107 S.Ct. at 372. The court then went on to hold that the "provision of unpaid leave eliminates the conflict between employment requirements and religious practices by allowing the individual to observe fully religious holy days and requires him only to give up compensation for a day that he did not in fact work." *Id.* at 70–71, 107 S.Ct. at 373.

In another religious accommodation case, *American Postal Workers, supra,* at 776–77, the Ninth Circuit considered whether the accommodation offered "reasonably preserve[d] the affected employee's employment status." The determination of whether the employment status of an employee has been reasonably preserved by the employer's offered accommodation is generally for the trier of fact. *Id.* at 777.

In the instant case, the accommodation offered was that plaintiff be given the swing-shift position he requested. The only question is whether the possibility that he would only work 36–40 hours a week, rather than a guaranteed 40 hours, was reasonable in light of the specific facts of this case. Defendants have offered the court evidence that, for the 3 years for which they have records, plaintiff regularly worked, by personal choice, less than 40 hours per week. However, plaintiff has offered what a trier of fact could find to be a reasonable explanation for his leave hours. It is unclear whether the offered position would have changed plaintiff's status from "full-time" to "part-time", with resulting change in seniority and other employee benefits, although the evidence offered indicates that Safeway's offer envisioned retaining plaintiff on the full-time seniority list, and to treat him in all respects as a full-time employee.[15]

The *Ansonia* decision supports a finding that plaintiff's employment status was not affected by the offer of clocking out. In *Ansonia,* the Supreme Court, quoting *Nashville Gas Co. v. Satty,* 434 U.S. 136,

145, 98 S.Ct. 347, 353, 54 L.Ed.2d 356 (1977), stated that:

> the direct effect of [unpaid leave] is merely a loss of income for the period the employee is not at work; such an exclusion has no direct effect upon either employment opportunities or job status.

*Ansonia,* 479 U.S. at 70–71, 107 S.Ct. at 373.

Both Washington and The Ninth Circuit recognize that the accommodation duty does not place the entire burden on the employer. Rather, the employee bears a "correlative duty to make a good faith attempt to satisfy his needs through means offered by the employer." *American Postal Workers,* 781 F.2d at 777. Thus, the Ninth Circuit recognizes "the existence of a concomitant duty on the part of an employee to cooperate in reaching an accommodation." *Id.* The employee has a duty to cooperate with the employer in the hunt for other suitable work by "making the employer aware of his qualifications, by applying for all jobs which might fit his abilities, and *by accepting reasonably compensatory work he could perform.*" *Dean v. Metropolitan Seattle,* 104 Wash. 2d at 637–38, 708 P.2d 393. (Emphasis added).

In *Prater v. Kent,* 40 Wash.App. 639, 699 P.2d 1248 (1985), the Court of Appeals refused to even consider a claim that the city failed to make reasonable accommodation for plaintiff's handicap, where the plaintiff failed to provide the city with sufficient information to evaluate her condition and place her in another position. *Id.* at 646, 699 P.2d 1248. In the instant case, it is clear that the medical evidence regarding plaintiff's ability to lift heavy objects was conflicting. This confusion necessitated adjournment of the grievance meeting held in September 1987. Nor did plaintiff provide Safeway with the unconditional doctor's release required by the collective bargaining agreement.

As for the question whether the accommodation plaintiff sought posed an undue burden for defendant, the *Ansonia* court

---

**15.** See footnote 4.

stated that "the extent of undue hardship on the employer's business is at issue only where the employer claims that it is unable to offer any reasonable accommodation without such hardship." 479 U.S. at 68–69, 107 S.Ct. at 372. If the court found that Safeway offered plaintiff a reasonable alternative, it would be error to require Safeway to demonstrate the hardship of his proposed alternatives. *Id.* at 69, 107 S.Ct. at 372.

In conclusion, the court finds that there are several disputed questions of material fact in evaluating the merits of plaintiff's claim, notably, what positions Safeway had available, if any, which did not involve order selecting, the actual extent of plaintiff's disability, and whether the offered accommodation reasonably preserved plaintiff's employment status. Defendant has come forward with evidence supporting its position that the offered accommodation was reasonable, in particular its assertion that plaintiff voluntarily chose to work less than 40 hours per week prior to his accident. However, plaintiff has offered the court evidence which, considered in the light most favorable to him, could reasonably explain that prior record. The evidence offered must be construed in the light most favorable to the nonmoving party. In the present posture of this case, the court cannot say, as a matter of law, that Safeway's offered accommodation was necessarily reasonable. The specific facts, coupled with undisputed background facts, are such that a rational trier of fact might find in plaintiff's favor on this issue. Therefore, summary judgment of dismissal is not appropriate.

## MITIGATION OF DAMAGES

■ Defendant also asks the court to enter partial summary judgment on the issue of plaintiff's duty to mitigate damages. Specifically, defendant asks the court to hold that it is not liable for backpay accruing subsequent to the date it made an unconditional offer to plaintiff, nor for frontpay.

"Where one person has committed a tort, breach of contract, or other legal wrong against another, it is incumbent upon the latter to use such means as are reasonable under the circumstances to avoid or minimize the damages." *Ward v. Painters' Local Union*, 45 Wash.2d 533, 542, 276 P.2d 576 (1954). The person wronged is barred from recovering for any item of damage which could thus have been avoided. *Id.* Washington courts have applied this rule to cases involving wrongful discharge of an employee. *Id.* at 542–43, 276 P.2d 576.

Parallel analysis under Title VII cases supports this principle. In *Ford Motor Co. v. EEOC*, 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982), the Supreme Court stated that the duty to minimize damages under 42 U.S.C. § 2000e–5(g)[16] requires the claimant to use "reasonable diligence in finding other suitable employment." *Id.* at 231, 102 S.Ct. at 3065. The court went on to state that:

> Although the unemployed or underemployed claimant need not go into another line of work, accept a demotion, or take a demeaning position, he forfeits his right to backpay if he refuses a job substantially equivalent to the one he was denied.

*Id.* at 231–32, 102 S.Ct. at 3065–66. Where the employer unconditionally offers the claimant the job he sought, thereby offering him the opportunity to mitigate his damages, the employer can toll the accrual of backpay liability. *Id.* at 232, 102 S.Ct. at 3066.

Termination of liability for backpay generally occurs "when the discriminatee is unconditionally and in a bona fide fashion offered the employment, reinstatement or promotion at issue. This can occur pursuant to a final court decree or pursuant to a voluntary bona fide offer of employment, reinstatement or promotion." *Thorne v. City of El Segundo*, 802 F.2d 1131, 1136 (9th Cir.1986), quoting B. Schlei and P.

---

**16.** 42 U.S.C. § 2000e–5(g) states that "[i]nterim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable."

Grossman, *Employment Discrimination Law* at 1432 (2d ed. 1983).

Front pay awards, like backpay awards, are also reduced by the amount the plaintiff could earn using reasonable mitigation efforts. *Cassino v. Reichhold Chemicals, Inc.*, 817 F.2d 1338, 1347 (9th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 785, 98 L.Ed.2d 870 (1988). Such awards of front pay do "not contemplate that a plaintiff will sit idly by and be compensated for doing nothing." *Id.* at 1347.

The question thus focuses on whether Safeway made such an unconditional, bona fide offer of employment, and if so, when. Plaintiff does not dispute that Safeway unconditionally offered him a position on the swing shift in salvage, subject to the option of clocking out should salvage work be caught up. Plaintiff does dispute whether it was a bona fide offer, to the extent that plaintiff alludes to bad faith "misrepresentation" as to the actual number of hours he might have to clock out. A finding of discrimination cannot be predicated on information the employer did not have at the time it made its decision. *Treadwell v. Alexander*, 707 F.2d 473, 477 (11th Cir. 1983). Therefore, no evidence offered of actual hours worked in order selecting after the offer was made is relevant. However, since it is disputed precisely when the offer was first made, this court cannot resolve the bad faith claim by summary judgment. In addition, the court has found that there exists a material fact in dispute as to whether there existed a full-time job in salvage which did not require temporary assignment to grocery. Construed in the light most favorable to plaintiff, this court cannot rule that, as a matter of law, Safeway made plaintiff a bona fide offer.

IT IS HEREBY ORDERED that defendant's motion for summary judgment SHALL BE DENIED.