Clarence B. CAIN and Anthony
Barone, Trustee,

v.

Joel HYATT, individually and t/a
Hyatt Legal Services, et al.

Civ. A. No. 88–6665.

United States District Court,
E.D. Pennsylvania.

April 3, 1990.

See also 101 B.R. 440.

Lanier Williams, Richard J. Silverberg, Philadelphia, for plaintiff.

Martin Wald and Michael G. Tierce, Schnader, Harrison, Segal & Lewis, Philadelphia, for defendant.

## MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

In this nonjury case, plaintiff Clarence Cain alleges that the defendants' decision to remove him as regional partner of Hyatt Legal Services because he had contracted acquired immune deficiency syndrome (AIDS) violated the Pennsylvania Human Relations Act, Act of October 27, 1955, Pub.L. No. 744 (codified as amended at 43 Pa.Stat.Ann. § 951 *et seq.*), which proscribes employment discrimination on the basis of non-job related handicap or disability. This Court has jurisdiction pursuant to 28 U.S.C. § 1332. *See Wolk v. Saks Fifth Avenue Inc.*, 728 F.2d 221 (3d Cir. 1984); *Davis v. United States Steel Supply*, 581 F.2d 335, 339 (3d Cir.1978); *Petit v. Sears, Roebuck & Co.*, 32 Fair Empl. Prac.Cas. (BNA) 1867 (E.D.Pa.1982). Having held a bench trial to consider the claim, the Court now finds in favor of the plaintiff.

### I. Findings of Fact

The facts of this case are not in serious dispute. Established in 1977, Hyatt Legal Services (Hyatt) is a general practice law firm with over 150 locations nationwide. As with any large interstate enterprise, Hyatt is complexly structured. The firm's primary unit of operation is the office. Offices in geographical proximity to one another are denominated a region. Several regions, in turn, are grouped into a division.

Generally, staff attorneys are assigned to a particular office and hold a nonmanagerial, entry-level position within the firm's hierarchy. They interview and cultivate clients, make court appearances, generate documents, and otherwise engage in all the duties that legal practitioners undertake. Hyatt mandates that each staff attorney commence his or her day no later than 9 a.m., remain in the office until 8 p.m. two evenings each week, and work at least every other Saturday. In 1987, Hyatt employed approximately 500 staff attorneys, almost all of whom earned between $20,000 and $24,000 annually.

A managing attorney heads each office. In addition to carrying a caseload, the managing attorney oversees staff attorneys and legal assistants. The managing attorney recruits, instructs, tenders regular evaluations of personnel, hears client complaints, and is charged with maintaining the profitability of the office.

The regional partner, who supervises all managing attorneys situated in the region's offices, is more akin to a business manager than a practicing lawyer. Unlike staff or managing attorneys, regional partners do not have a caseload or represent clients. Instead, they recruit and train attorneys, evaluate subordinates, inspect offices and files, handle client complaints, organize seminars, and engage in various administrative duties. Like staff and managing attorneys, however, regional partners possess no equity in the firm and are at-will employees. In August 1987, there were 25 regional partners nationwide.

As noted earlier, regions are combined into divisions. Each division is headed by a national partner, who supervises the division's regional partners. National partners in turn report to a managing partner or a senior partner. The senior partners, defendants Joel Hyatt, Wayne Willis, William Brooks, and Susan Hyatt, promulgate firm policy and hold equity interests in the organization. In 1987, Willis also served as a managing partner.

Hyatt employees accumulate two sick days for every three months of service and one week of vacation time every six months. The firm also has a medical leave policy, which permits attorneys and legal assistants to take, as a matter of right, a thirty day unpaid leave of absence due to illness or injury. They may take up to three months with the approval of the supervising national partner. An employee does not forfeit benefits or seniority while on unpaid leave. The firm, however, does not guarantee that the employee can return to the exact position he or she had prior to an extended absence, although by policy it will make an effort to do so. When regional partners take pregnancy leaves, which have lasted over two months in duration, managing attorneys assume regional partner duties until they return.

On April 7, 1986, Cain, a graduate of the University of Virginia School of Law with almost ten years' legal experience, entered Hyatt's Fast Track Regional Partner Program, which was specially tailored by Hyatt to attract talented and knowledgeable attorneys. Bypassing the usual entry-level position of staff attorney, Fast Track participants begin their employment with the firm as managing attorneys. Candidates have six months in which to be either promoted to regional partner or terminated.

After completing a two-week training session at the firm's headquarters in Kansas City, Cain was appointed managing attorney of the Falls Church, Virginia Office. The plaintiff's work in that position was exemplary, and, on November 24, 1986, he was promoted to regional partner of the firm's Philadelphia Region South. In December 1986, Hyatt management consolidated Philadelphia North and Philadelphia South into a single region, which comprised ten offices with thirty-five attorneys and another thirty-five staff members. Cain continued to serve as partner of this new region. His salary was $40,000 per year.

Because the Philadelphia region long had been languishing so seriously, by late January 1987 Willis divided the regional partner duties among three individuals. Cain performed most of the functions. A managing attorney and Fast Track participant, Earl Fisher, assisted with recruiting and

reviewing the performance of staff members. Defendant Robert Croyle, who was a Hyatt national partner and Cain's immediate supervisor, took up residence in Philadelphia in order to focus his energies on the region's rehabilitation.

In March 1987, Cain's relationship with his superiors began to deteriorate. Although the plaintiff spent over half of his time recruiting, he regarded the task as distasteful and dull. Cain told Croyle that in particular he disliked the "sales" component of recruiting and that Hyatt needed someone to assume the responsibility full-time. He similarly demonstrated little desire to review the managing attorneys under his authority.

The plaintiff's conflict with Willis and Croyle stemmed partially from the fact that, as alluded to earlier, the Philadelphia region always had been an unhappy one. Since its inception in 1981, the region has never turned a profit on an annualized basis and even lost over a million dollars a year prior to 1986, has had a high turnover of regional partners, and, in 1987, was significantly understaffed. In fact, Philadelphia North did not even have a regional partner for at least six months prior to Cain's assumption of his post. Cain complained to his superiors that one person could not possibly rectify all the difficulties. The tensions that this situation naturally created were further aggravated by Cain's apparent disagreement with Hyatt's upper-level management about what strategy would best alleviate the troubles in Philadelphia. Croyle and Willis believed that the proper emphasis was on recruiting. The plaintiff, however, perceived the staff's lack of training to be source of the region's ills.

In May 1987, although Croyle had reprimanded Cain for processing client complaints in an unsatisfactory manner, the firm, with Croyle's approval, raised Cain's yearly compensation to $44,000, which rendered the plaintiff one of Hyatt's highest paid regional partners. The plaintiff then was hospitalized briefly for minor surgery in June. Croyle and Fisher handled the regional partner responsibilities during Cain's absence. Upon his return, and despite his pay raise, the plaintiff's seeming dissatisfaction with his position intensified. Prior to a June divisional regional partner's meeting in Washington, D.C., Cain had dinner at a hotel restaurant with Croyle and other colleagues. The plaintiff loudly voiced derogatory comments about the firm and its senior partners. During the course of the partner's meeting itself, Cain disrupted the proceedings with unprofessional remarks.

On the following day, Croyle and the plaintiff took a train back to Philadelphia. Croyle told Cain that if he ever engaged in such conduct again he would be fired. Croyle also reprimanded the plaintiff for his lack of organization and direction. Cain asked whether Croyle wanted him to resign, and Croyle said no. After Cain told Croyle that he felt overwhelmed by the job, the two agreed that Cain needed to devise a coherent scheme to rescue the region. The plaintiff stated he would draft a plan.

Croyle again criticized the plaintiff for his performance and attitude on July 6, 1987. He noted that Cain lacked energy and interest in executing his duties as regional partner. Cain replied that he was "not a cheerleader."

On July 13, 1987, Cain entered Pennsylvania Hospital with pneumocystis pneumonia. Three days later, he was diagnosed as having AIDS. When Croyle visited Cain in the hospital on July 21st, the plaintiff told Croyle that he had AIDS and asked him to speak with Dr. Michael Braffman, Cain's treating physician, about the condition. Cain related his desire to return to work as soon as possible and begged Croyle to help him retain his job.

Croyle conferred with Dr. Braffman on the next day. Dr. Braffman confirmed that Cain was recovering from his AIDS-related pneumonia. Although the doctor repeatedly stressed that he could not predict with certainty the future course of Cain's illness because that varied from patient to patient, he opined that Cain likely would be discharged from the hospital near the end of the month and would be able to return to Hyatt by mid-August. When Croyle

pressed for a more definite schedule, the doctor reiterated that he could not do so. Dr. Braffman did tell Croyle that most AIDS patients returned to their jobs after the first hospitalization, that initially they had to resume employment-related responsibilities on a part-time basis, that they usually then were capable of functioning full-time, and that many persons with AIDS die within a year or two of their diagnosis. Dr. Braffman again stated that no physician could determine during a patient's first hospitalization whether that particular person will fall within these boundaries.

Shortly afterward, Croyle related to Willis the conversation with Dr. Braffman, but, despite the doctor's clear and repeated admonitions, Croyle did so by applying Dr. Braffman's general statistics to Cain specifically. Croyle later memorialized his understanding of the doctor's prognosis:

> On July 22, 1987, ... [Dr. Braffman] said that [Cain] would be discharged from the hospital on July 31, 1987. He would then need several weeks to recover and would not be able to return to work until early mid-August. He indicated that Clarence could function in the job in the "short term". He indicated that in returning to work he would have to work half or partial days to recover and then would be able to function in the short term. He defined the short term as 30, 60, 90 days up to nine months. He indicated his ability to function would be a day to day, week to week process. He recommended and encouraged all of his patients with AIDS to return to employment in the short term. Long term, which he defined as year to year and a half, the disease would be terminal.

Memorandum from Bob Croyle to Wayne Willis, July 31, 1987 (Def. Ex. 8).

Thus, within a week of the plaintiff's diagnosis and while he was still in the hospital, Willis and Croyle decided to remove Cain from his position for two reasons. First, based solely on their understanding of Dr. Braffman's statements, Willis and Croyle concluded that over time Cain would become fully disabled and therefore incapable of executing his obligations as regional partner. They consulted no other physician or medical authority. Second, as Willis and Croyle testified, they were concerned that having a person with AIDS as regional partner would damage the "morale" of the Philadelphia region's staff. Neither Willis nor Croyle knew at that time whether AIDS could be transmitted through casual contact. In other words, it is apparent that not only did Croyle and Willis themselves feel apprehensive about the communicability of AIDS, they also imputed similar fears to their employees. These anxieties were a significant factor in Hyatt's decision to fire the plaintiff.

Although the firm's termination policy vested Willis and Croyle with authority to remove Cain, Willis sought the guidance of Hyatt's other senior partners. Each of the senior partners agreed that Cain had to be removed. Perceiving Fisher to be the most logical candidate to succeed Cain, Willis and Croyle then withdrew the firm's previous offer of a regional partnership in Denver and extended him the Philadelphia post. On approximately July 28th, Fisher formally acceded to the regional partner position, but with the understanding that he would fill it for one year only. Fisher had Cain's desk cleared off because he did not want to touch any items associated with Cain.

Meanwhile, in Pennsylvania Hospital, the plaintiff became increasingly distraught. He was convinced that Hyatt planned to fire him. Although Cain had been attempting to perform some of his regional partner functions while in the hospital and members of his staff often had telephoned him to conduct firm business during the earlier portion of Cain's hospitalization, the calls ceased after Croyle's visit. No member of Hyatt's senior management contacted the plaintiff in the hospital during the later part of July.

On July 30th, Croyle again spoke with Dr. Braffman. Croyle inquired about available treatment programs for Cain. Dr. Braffman replied that it was too early to determine what medical response was appropriate in the plaintiff's case. Dr.

Braffman also advised Croyle that because Cain was so upset and angry about the prospect of losing his job, Croyle should not visit the plaintiff until he had an opportunity to recover further.

The next day, Cain left Pennsylvania Hospital to recuperate at home. On August 2d, Fisher called the plaintiff there and asked him whether Croyle had spoken to him. Cain said that he had not. After a brief conversation, Cain understood that he had been fired. Fisher then telephoned Croyle and demanded that Croyle tell Cain directly that he had been removed from his position at Hyatt. Croyle contacted the plaintiff. They agreed to meet on the following afternoon.

On August 3d, Croyle went to Cain's apartment. Even though Cain had not yet exhausted his sick and vacation days, Croyle told the plaintiff that because he had AIDS and because of his past conduct "under no circumstances" would the firm allow him return to his former post. He informed Cain that in Dr. Braffman's view the plaintiff would not be able to do the job and that Hyatt already had replaced him. Croyle then outlined Cain's options. Cain could accept a $12,000 severance package, a staff attorney position in Falls Church, or assistance in securing placement in an experimental AIDS-treatment program at Johns Hopkins University. Cain became hysterical. He told Croyle he wanted his old job back and ordered Croyle out of the house.

On August 5th, Hyatt placed Cain on a three-month medical leave of absence and removed him from the Hyatt payroll. Later that month, the plaintiff asked Willis to reinstate him as regional partner. Willis instead offered Cain an administrative position in Kansas City, which he refused.

By the close of August, Cain's health had improved markedly under Dr. Braffman's care. Having responded well to the drug azidothymidine (AZT), the plaintiff had regained his energy and much of his weight. In Dr. Braffman's professional opinion, Cain could have returned as regional partner by the beginning of September. After Cain moved to the Washington, D.C. area in October 1987, Dr. Micheal Pistole, an AIDS specialist, began treating Cain. In Dr. Pistole's professional opinion, as of October, the plaintiff could have performed his duties as regional partner without restriction and continued to do so fully until about June 13, 1988. Because the plaintiff had contracted a bronchial infection, suffered from an intestinal disorder, and lost considerable weight, Dr. Pistole doubted that he would have been able to work after that period. Cain has been afflicted with myriad ailments from June 1988 to the present.

■ Dr. Pistole also found that Cain generally has had mild to moderate reactive depression and, during periods of greater ill health, fairly severe depression. Cain's depression has manifested itself in sleep disturbances, anxiety, and a lack of motivation. In January 1988, Dr. Pistole prescribed Halcyon to aid the plaintiff in sleeping. During the summer of 1988, the doctor increased Cain's dosage of Elavil, which he had prescribed for the plaintiff's neuropathy, to antidepressant levels. Dr. Pistole ascribes Cain's reactive depression to his contraction of AIDS and the loss of his job.[1]

Pursuant to the Pennsylvania Human Relations Act (PHRA), 43 Pa.Stat.Ann. § 951 *et seq.*, Cain filed a complaint with the Pennsylvania Human Relations Commission. He charged that Hyatt illegally had terminated him on the basis of a non-

---

1. Dr. Pistole's testimony was introduced by trial deposition. During the deposition, the defendants objected to his opinion on the ground that Dr. Pistole was not qualified to address the plaintiff's mental health. This is incorrect. He had formal psychiatric training while in medical school. More importantly, Dr. Pistole has seen hundreds of AIDS patients, many of whom suffer from milder forms of depression, which he treats. He also works in conjunction with mental health specialists if an AIDS patient is beset by acute psychological difficulties. This experience and on-the-job training is more than sufficient. *See Habecker v. Copperloy Corp.,* 893 F.2d 49 (3d Cir.1990). Dr. Pistole, as treating physician, has had the most contact with the plaintiff over the longest period of time. In the Court's view, his conclusions therefore are entitled to great weight.

job related handicap or disability. On June 29, 1988, during a meeting in the Commission's offices, the defendants formally offered to remit to Cain complete backpay, including all fringe benefits. They also proposed to reinstate the plaintiff to employment comparable to that of regional partner—the position had been eliminated under a Hyatt reorganization plan—at $44,000 per year. This offer of adjustment did not require Cain to relinquish any legal claims he had against the firm. Cain rejected the proposal, and, for that reason, the Commission closed the case on July 21, 1988. *See* 16 Pa.Code § 42.62. Litigation in this Court followed.

## II. Conclusions of Law

■ *Erie Railroad v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and its progeny require a federal court sitting in diversity to apply state substantive law, which includes the authoritative pronouncements of the state's highest judicial tribunal. In the absence of such guidance, the Court must predict how that tribunal would rule if the issue were presented to it. *Hospital Support Serv., Ltd. v. Kemper Group*, 889 F.2d 1311, 1313 (3d Cir.1989). The Third Circuit has held:

> To make this prognostication, we are not inflexibly confined by dicta or by lower state court decisions, although we should look to such statements as indicia of how the state's highest court might decide. The policies underlying the applicable legal doctrines, the doctrinal trends indicated by these policies, and the decisions of other courts may also inform our analysis. In addition, we may consult treatises, the Restatement, and the works of scholarly commentators.

*Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.*, 652 F.2d 1165, 1167 (3d Cir.1981); *see also West v. AT & T Co.*, 311 U.S. 223, 236–37, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940).

In the specific context of the PHRA, two principles of interpretation must be highlighted. First, the Court is bound to construe the Act "liberally," 43 Pa.Cons.Stat. Ann. § 962(a), and "in the manner which will effectuate its purpose, a task which compels consideration of more than the statute's literal words." *Pennsylvania Human Relations Comm'n v. Chester Sch. Dist.*, 427 Pa. 157, 166–67, 233 A.2d 290, 295 (1967). Second, the Pennsylvania legislature modeled the PHRA on Title VII of the Civil Rights Act of 1964, 78 Stat. 253 (codified as amended at 42 U.S.C. § 2000e *et seq.*), and the federal Rehabilitation Act of 1973, Pub.L. No. 93–112, 87 Stat. 355 (codified as amended at 29 U.S.C. §§ 709–796i). *McWilliams v. AT & T Information Sys.*, 728 F.Supp. 1186 (W.D.Pa.1990); *Murphy v. Cartex Corp.*, 377 Pa.Super. 181, 546 A.2d 1217 (1988); *Pennsylvania State Police v. Pennsylvania Human Relations Comm'n*, 72 Pa.Cmwlth. 520, 528–29, 457 A.2d 584, 589 (1983). As a result, the Pennsylvania Supreme Court often has employed federal caselaw in its construction of the Act. *See, e.g., General Elec. Corp. v. Commonwealth Human Relations Comm'n*, 469 Pa. 292, 303–06, 365 A.2d 649, 654–57 (1976); *see also Winn v. Trans World Airlines*, 75 Pa.Cmwlth. 366, 371–72, 462 A.2d 301, 303–04 (1983), *aff'd by equally divided court*, 506 Pa. 138, 484 A.2d 392 (1984).

### A.

The PHRA declares that it shall be unlawful for an employer to discharge or otherwise discriminate against any individual "with respect to compensation, hire, tenure, terms, conditions or privileges of employment" because of that person's "non-job related handicap or disability" if he or she "is the best able and most competent to perform the services required." 43 Pa.Stat.Ann. § 955. The Pennsylvania Human Relations Commission has augmented the statutory scheme by promulgating several interpretive regulations. A "handicapped or disabled person" is one who "(A) has a physical or mental impairment which substantially limits one or more major life activities; (B) has a record of such impairment; or (C) is regarded as having such an impairment." 16 Pa.Code § 44.4(4)(i). A "physical impairment" is "a physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neu-

rological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive; digestive; genitourinary; hemic and lymphatic; skin, and endocrine ..." *Id.* § 44.4(4)(ii)(A). "Major life activities" are "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Id.* § 44.4(4)(ii)(B). One "is regarded as having such an impairment" if one possesses a physical impairment "that does not substantially limit major life activities but that is treated by an employer ... as constituting such a limitation" or one "that substantially limits major life activities only as a result of the attitudes of others toward such impairment." *Id.* § 44.4(4)(ii)(D).

The Commission adopted these definitions verbatim from United States Department of Health, Education and Welfare regulations, which were "drafted with the oversight and approval of Congress." *School Board of Nassau County v. Arline,* 480 U.S. 273, 279, 107 S.Ct. 1123, 1127, 94 L.Ed.2d 307 (1987). Given this genealogy and given that the Commission enacted the regulations pursuant to its rulemaking authority, 43 Pa.Stat.Ann. § 957, the Court expresses no doubt that the Pennsylvania Supreme Court would approve them. *See Pennsylvania State Police,* 72 Pa.Cmwlth. at 529, 457 A.2d at 588–89. *See generally Pennsylvania Human Relations Comm'n v. Uniontown Area School Dist.,* 455 Pa. 52, 313 A.2d 156 (1973).

■ The threshold issue therefore is whether AIDS constitutes a handicap within the meaning of the PHRA. For two reasons the Court predicts that the Pennsylvania Supreme Court would find that it does. First, both the underlying viral condition and the symptomology of AIDS give rise to physical impairments that substantially limit one's abilities to engage in major life activities. Second, societal prejudices deem persons with AIDS as having such an impairment.

The Court initially notes that the consensus of opinion holds AIDS qualifies as a handicap or disability under various federal and state antidiscrimination laws. Courts construing federal legislation analogous to the PHRA have declared that infection with the human immunodeficiency virus (HIV) or AIDS is a handicap. *See Martinez v. School Bd. of Hillsborough County,* 861 F.2d 1502, 1506 (11th Cir.1988) (holding AIDS a handicap under Rehabilitation Act); *Chalk v. United States District Court,* 840 F.2d 701 (9th Cir.1988) (reversing denial of preliminary injunction seeking reinstatement of teacher with AIDS to classroom duties under Rehabilitation Act); *Baxter v. City of Belleville,* 720 F.Supp. 720, 730 (S.D.Ill.1989) (concluding HIV carriers handicapped under Fair Housing Act, 42 U.S.C. § 3601 *et seq.*); *Robertson v. Granite City Comm. Unit School Dist.,* 684 F.Supp. 1002, 1006–07 (S.D.Ill.1988) (holding student with AIDS-related complex handicapped under Rehabilitation Act); *Thomas v. Atascadero Unified School Dist.,* 662 F.Supp. 376, 381 (C.D.Cal.1986) (holding child with AIDS handicapped under Rehabilitation Act). Similarly, two-thirds of the states have announced either administratively or judicially that AIDS-related discrimination is illegal under their statutes. *See, e.g., Raytheon Co. v. Fair Empl. & Hous. Comm'n,* 46 Fair Empl. Prac.Cas. (BNA) 1089 (Cal.Super.Ct.1988), *aff'd,* 212 Cal.App.3d 1242, 261 Cal.Rptr. 197 (1989); *District 27 Comm. School Bd. v. Board of Educ.,* 130 Misc.2d 398, 502 N.Y.S.2d 325 (Sup.Ct.1986); *see also* Leonard, *AIDS, Employment and Unemployment,* 49 Ohio St. L.J. 929, 939–40 & nn. 74–89 (1989) (collecting decisions); Brown, *AIDS Discrimination in the Workplace: The Legal Dilemma,* Case & Comment, Nov.–Dec. 1989, at 49 (citing National Gay Rights Advocates, AIDS and Handicap Discrimination: A Survey of the 50 States and the District of Columbia (1986)). This includes the Pennsylvania Human Relations Commission, which considers AIDS to be a handicap or disability under the PHRA. Pennsylvania Human Relations Comm'n Policy Directive: Reaffirmation of the PHRC's AIDS Policy, Policy No. 88–01 (June 2, 1988); *see also M.A.E. v. Doe & Roe,* 566 A.2d 285, 287 (Pa.Super.1989) (Ca-

vanaugh, J., concurring) (stating AIDS a disability or handicap under PHRA).

A retrovirus called the human T-lymphotropic virus type III/lymphadenopathy-associated virus, and more commonly known as HIV, is the causative agent of AIDS. Briefly stated, HIV penetrates and then disables white blood cells that normally check the growth of parasitic infections in the body. HIV-seropositivity, AIDS-related complex (ARC), and AIDS form a spectrum of related conditions. There is a time lapse, often of several years, between exposure to HIV and the onset of symptoms generally identified with ARC or AIDS, and it presently is unclear how many HIV-infected persons eventually will develop AIDS. A person with ARC manifests some perceptible symptoms of illness, such as persistent fever, weight loss, fatigue, and diarrhea. AIDS itself is a clinical construction or designation reflecting the collapse of the patient's immune system, the consequences of which are an array of opportunistic infections and malignancies. Today, AIDS is incurable and fatal. *See generally Revision of the CDC Surveillance Case Definition for Acquired Immunodeficiency Syndrome*, 36 Morbidity & Mortality Weekly Rep. 1S (Aug. 14, 1987 Supp.); Mueller, *The Epidemiology of the Human Immunodeficiency Virus Infection*, 14 Law, Med. & Health Care 250 (1986); *Classification System for Human T–Lymphotropic Virus Type III/Lymphadenopathy–Associated Virus Infections*, 35 Morbidity & Mortality Weekly Rep. 334, 336–37 (1986).

First, even if it were asymptomatic, the plaintiff's HIV infection constitutes a substantial physical limitation upon major life activities. HIV, which disables white blood cells, including lymphocytes, "creates a physiological disorder of the hemic (blood) and lymphatic systems." *Doe v. Dolton Elem. School Dist. No. 148*, 694 F.Supp. 440, 444 (N.D.Ill.1988). Because of the risk of transmission, an HIV carrier cannot procreate "without endangering the lives of both the offspring and the other parent." *Id.* Accord Note, *Asymptomatic Infection with the AIDS Virus as a Handicap Under the Rehabilitation Act of 1973*, 88 Colum.L.Rev. 563, 572 (1988). There is no gainsaying that this significant injury to the reproductive system impedes a major life activity. The interests in conceiving and raising one's own children "have been deemed 'essential,' 'basic civil liberties of man,' and '[r]ights far more precious ... than property rights.'" *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972) (citations omitted). Like all AIDS victims, the plaintiff also has suffered a constellation of symptoms that greatly hinder other major life activities. For example, he has had pneumocystis carinii pneumonia, a disorder of the respiratory system, which dramatically impaired his ability to breathe and interact with others. *See generally* Note, *AIDS: Does It Qualify as a "Handicap" Under the Rehabilitation Act of 1973?*, 61 Notre Dame L.Rev. 572, 585 (1986).

Second, since first identified in the early 1980s as a distinct medical condition, AIDS has engendered such prejudice and apprehension that its diagnosis typically signifies a social death as concrete as the physical one which follows. Only three methods are known to spread HIV: sexual intercourse, transfusion of infected blood products, and perinatal contact. Excluding healthcare professionals who perform invasive procedures, AIDS cannot be transmitted through workplace exposure, Centers for Disease Control, *Recommendations for Preventing Transmission of Infection with Human T–Lymphotropic Virus Type III/Lymphadenopathy–Associated Virus in the Workplace*, 34 Morbidity and Mortality Weekly Rep. 682 (1985) (finding "[t]he kind of nonsexual person-to-person contact that generally occurs among workers and clients or consumers in the workplace does not pose a risk of transmission" of HIV), or through sharing a household with an infected person. Fischl, et al., *Evaluation of Heterosexual Partners, Children and Household Contacts of Adults with AIDS*, 257 J. A.M.A. 640 (1987); U.S. Public Health Service, *Surgeon General's Report on Acquired Immune Deficiency Syndrome* at 13 (1986).

Yet, despite authoritative medical evidence to the contrary, fully one-third of the American population believes "AIDS is as contagious, or more contagious, than the common cold," Note, *The Constitutional Rights of AIDS Carriers*, 99 Harv.L.Rev. 1274, 1274 n. 6 (1986), and "[f]ew aspects of a handicap give rise to the same level of public fear and misapprehension as contagiousness." *Arline*, 480 U.S. at 284, 107 S.Ct. at 1129. The pervasive anxiety that AIDS is easily transmitted converges with and often ostensibly justifies the disapprobation of AIDS victims. Societies long have entertained bizarre conceptions about the etiology of illness and interpreted the contraction of disease, including cancer, as punishment for moral turpitude. *Id.* at 284 & nn. 12–13, 107 S.Ct. at 1129 & nn. 12–13; S. Sontag, Illness as Metaphor 6 (1978); Hoffman, *Employment Discrimination Based on Cancer History: The Need for Federal Legislation*, 59 Temple L.Q. 1, 2–9 (1986). The particular associations AIDS shares with sexual fault, drug use, social disorder, and with racial minorities, the poor, and other historically disenfranchised groups accentuates the tendency to visit condemnation upon its victims. S. Sontag, AIDS and Its Metaphors 44–46, 54–59 (1989); *see also* Dunlap, *AIDS and Discrimination in the United States: Reflections on the Nature of Prejudice in a Virus*, 34 Vill.L.Rev. 909, 917–20 (1989).

AIDS mythology has fomented not only private judgments about carriers of the virus. It has spawned calls for punitive, oppressive official action against them "in every public forum and institution in this society, in virtually every context imaginable." *Id.* at 913. Vast segments of the American populace favor the forced quarantine of persons with AIDS, Sullivan & Field, *AIDS and the Coercive Power of the State*, 23 Harv.C.R.–C.L.L.Rev. 139, 143–46 (1988); Parmet, *AIDS and Quarantine: The Revival of an Archaic Doctrine*, 14 Hofstra L.Rev. 53 (1985), tattooing HIV-positive persons for ready identification, Blendon & Donelan, *Discrimination Against People with AIDS: The Public's Perspective*, 319 New Eng.J.Med. 1022, 1026 (1988), and banishing HIV carriers

from the workplace and school. *Id.* Thus, to conclude that persons with AIDS are stigmatized is an understatement; they are widely stereotyped as indelibly miasmic, untouchable, physically and morally polluted.

These and related prejudices substantially curtail the major life activities of AIDS victims. They are shunned socially and often excluded from public life. As the Supreme Court has observed, "[S]ociety's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment." *Arline*, 480 U.S. at 284, 107 S.Ct. at 1129. In this case, the defendants not only afforded weight to the debilitating attitudes that they attributed to others, but they themselves also considered the plaintiff to be handicapped. Because of Cain's condition, he was removed from his job, which terminated his ability to socialize with others and to pursue his profession. *See Baxter*, 720 F.Supp. at 729–30.

### B.

A handicap or disability is "non-job related" if it "does not substantially interfere with the ability to perform the essential functions" of the position at issue. 43 Pa. Stat.Ann. § 954(p). As noted earlier, two considerations motivated the defendants to remove Cain from the regional partner position. First, they believed that the progressive symptomology of the illness would render Cain incapable of executing his obligations as regional partner in the future. That is, they concluded that his disability would become job related. Second, the defendants apprehended that Cain's colleagues would fear working with him because of the underlying viral condition, with its perceived risk of transmission. The Court cannot agree that either aspect of Cain's handicap was job related under the circumstances.

■ First, although it is at least plausible to contend that the former, symptomatic dimension of Cain's handicap would become job related, the latter, asymptomatic one clearly is non-job related. The plain-

tiff demonstrated that there was no actual risk of infection involved, and the defendants never argued to the contrary. *See Arline*, 480 U.S. at 287–88, 107 S.Ct. at 1130–31. Moreover, the asserted reticence or unwillingness of coworkers and clients to associate with an AIDS victim who is without any contagious opportunistic infections does not convert a handicap into a job-related one. The "unreasonable and unfounded fears of coemployees is not an exception to an employer's obligation not to discriminate against a handicapped person." *Jansen v. Food Circus Supermarkets*, 110 N.J. 363, 373, 541 A.2d 682, 687 (1988); *see also* Leonard, *AIDS and Employment Law Revisited*, 14 Hofstra L.Rev. 11, 40–41 (1985). Under Title VII, "[c]ustomer preference has repeatedly been rejected as a justification for discrimination against women.... It is similarly ... forbidden ... to refuse on racial grounds to hire someone because your customers or clientele do not like his race." *Rucker v. Higher Educ. Aids Bd.*, 669 F.2d 1179, 1181 (7th Cir.1982) (citing *Fernandez v. Wynn Oil Co.*, 653 F.2d 1273, 1276–77 (9th Cir.1981)); *see also* 29 C.F.R. § 1604.1(ii) (stating "the refusal to hire an individual because of the preferences of co-workers, the employer, clients or customers" not permissible under Title VII). The rationale for this rule is wholly applicable to the PHRA. To permit an employer to circumvent the dictates of the antidiscrimination statute by declaring an individual unfit because the prejudices of its employees commanded it to do so would be "totally anomalous," *Diaz v. Pan American World Airways*, 442 F.2d 385, 389 (5th Cir.), *cert. denied*, 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971), for the purpose of the Act is to eradicate the harm that ubiquitous stereotyping perpetuates. 43 Pa.Stat.Ann. § 952.

Second, the Court does not understand the defendants to argue, and the evidence does not show, that they perceived the symptomatic aspect of Cain's handicap to be job related when he was terminated. They knew that Cain was recovering from his pneumonia and that he likely would return to work by mid-August. Willis and Croyle repeatedly testified that at the time they decided to remove Cain their principal concern was that he would "become" disabled. A preponderance of the evidence also established that from September 1987 until June 1988 the plaintiff's illness in fact would not have impaired his ability to function as regional partner. In other words, the handicap was not job related during that time. The pertinent inquiry therefore is whether Cain's heightened risk of future symptomatic job-related disability, as understood when the termination decision was made, warranted the action. The Court finds that it did not. Further, to whatever degree Cain's disability temporarily interfered with his capacity to work, Hyatt could have provided accommodation without undue hardship.

As an initial matter, the Court doubts that the Pennsylvania Supreme Court ever would allow an employer's qualms, well-founded or not, concerning the future performance of a employee or applicant who is presently able to discharge the functions of the position to justify adverse employment action, unless the safety of that person or others was implicated. *See State Div. of Human Rights v. Xerox Corp.*, 65 N.Y.2d 213, 491 N.Y.S.2d 106, 480 N.E.2d 695 (1985) (rejecting as valid defense statistical likelihood that applicant's medical condition would produce impairments in future). An employer's conclusion that a given person will be physically unable to satisfy job requirements in the long-run almost always will rest on inherently speculative grounds. *See* Leonard, *supra*, 14 Hofstra L.Rev. at 28–29; Comment, *Section 504 of the Rehabilitation Act: Analyzing Employment Discrimination Claims*, 132 U.Pa.L.Rev. 867, 884–91 (1984). "[A]llowing remote concerns to legitimize discrimination against the handicapped would vitiate the effectiveness" of the PHRA, for "[p]otentially troublesome health problems will affect a large proportion of the handicapped population. Consistent attendance and an expectation of continuity will be important to any employer." *Bentivegna v. United States Dep't of Labor*, 694 F.2d 619, 623 (9th Cir.1982) (construing Rehabilitation

Act of 1973). Indeed, because the alleged long-term complications associated with handicaps often will not have manifested themselves at trial time, acceptance of the defense tends to invite courts to ascertain merely whether the employer's decision to terminate was reasonable, a standard that fundamentally is at cross-purposes with the Act. *Compare Strathie v. Pennsylvania Dep't of Transp.*, 716 F.2d 227, 231 (3d Cir.1983) ("[B]road judicial deference resembling that associated with the 'rational basis' test would substantially undermine Congress' intent in enacting section 504 that stereotypes or generalizations not deny handicapped individuals equal access to federally-funded programs.") *and* Comment, *supra*, 132 U.Pa.L.Rev. at 876–91, *with* 16 Pa.Code § 44.15 (including "length of service the employer can reasonably expect before the employe's handicap or disability is likely to become job-related" as factor in determining permissibility of termination).

■ Assuming such a defense is available at all in a disparate treatment case, an employer's conclusion that a handicap or disability will become job related must be predicated at the very least on objective, individualized, and medically valid evidence. "The essence of discrimination ... is the formulation of opinions about others not on their individual merits, but on their membership in a class with assumed characteristics." *Jansen*, 110 N.J. at 378, 541 A.2d at 689. To sanction a nonparticularized assessment would permit an employer to rely on precisely the type of reflexive suppositions about a handicapped person's capabilities that the PHRA was designed to prohibit. As the Supreme Court has phrased it, the "mere possession of a handicap is not a permissible ground for assuming an inability to function in a particular context." *Southeastern Community College v. Davis*, 442 U.S. 397, 405, 99 S.Ct. 2361, 2366, 60 L.Ed.2d 980 (1979) (interpreting Rehabilitation Act of 1973); *see also Strathie*, 716 F.2d at 231. Additionally, the PHRA, like the Rehabilitation Act, is structured to replace uninformed stereotyping "with actions based on reasoned and medically sound judgments." *Arline*, 480 U.S. at 285, 107 S.Ct. at 1129.

None of these rudimentary principles informed Hyatt's determination that Cain would become unable to perform his duties. The only medically grounded opinion which the firm's management considered was that of Dr. Braffman, and he explicitly warned the defendants that during the plaintiff's first AIDS-related hospitalization no conclusion about Cain's long-term condition could be distilled from his general statements. Thus, because the defendants relied solely on Dr. Braffman's broad statistical data in reaching their view, the adverse employment action, which was taken within a week of the plaintiff's diagnosis, was not based on medically sound or individualized information. Rather, it emanated from nothing more than their pernicious misconceptions about Dr. Braffman's prognosis and their unfounded factual assumptions regarding Cain's prospective physical disability. *See Pushkin v. University of Colorado*, 658 F.2d 1372, 1387 (10th Cir.1981).

■ Furthermore, like the Rehabilitation Act of 1973, *see, e.g., Strathie*, 716 F.2d at 230, the PHRA imposes upon employers the duty reasonably to accommodate handicapped individuals. An employer is relieved of this obligation only if it demonstrates accommodation would work an undue hardship on the enterprise's operation. *Jenks v. Avco Corp.*, 340 Pa.Super. 542, 549, 490 A.2d 912, 916 (1985); *Department of Transp. v. Pennsylvania Human Relations Comm'n*, 84 Pa.Cmwlth. 98, 105, 480 A.2d 342, 346–47 (1984), *remanded*, 510 Pa. 401, 508 A.2d 1187 (1986); 16 Pa.Code § 14.14. "As long as a reasonable accommodation available to the employer could have plausibly enabled a handicapped employee to adequately perform his job, an employer is liable for failing to attempt that accommodation." *Kimbro v. Atlantic Richfield Co.*, 889 F.2d 869, 879 (9th Cir. 1989) (applying Washington state law).

That the defendants made absolutely no effort to accommodate the plaintiff's disability is patently obvious. They terminated him as regional partner within one week

of his having informed them that he had AIDS. They did not consult either Cain or his treating physician regarding what, if any, alterations would be necessary to allow Cain to resume his employment. When Croyle told the plaintiff that he had been removed, he stated that "under no circumstances" would Cain be permitted to return as regional partner. Indeed, the defendants affirmatively impeded Cain's attempt to discharge his responsibilities from the hospital when they directed Hyatt employees to cease telephone contact with the plaintiff. *See Toledo v. Nobel–Sysco, Inc.,* 892 F.2d 1481, 1490 (10th Cir.1989) (holding "an employer who has made no efforts to accommodate the religious beliefs of an employee or applicant before taking action against him may only prevail if it shows that no accommodation could have been made without undue hardship.").

■ The duty of accommodation dictated that Hyatt could not remove the plaintiff from the position during his first AIDS-related hospitalization without affording him an opportunity to return to work and endeavor to satisfy its demands. To that end, the defendants were obligated to permit the plaintiff to exhaust his sick and vacation days and then, if necessary, place him on a medical leave of absence until he could return to his former job or until the situation posed an undue hardship on Hyatt. *See, e.g., Kimbro,* 889 F.2d at 878–79; *Chambers v. Omaha Girls Club, Inc.,* 834 F.2d 697, 708–09 (8th Cir.1987) (McMillian, J., dissenting); *McElrath v. Kemp,* 714 F.Supp. 23, 27–28 (D.D.C.1989); *Callicotte v. Carlucci,* 698 F.Supp. 944, 949–50 (D.D.C.1988); Leonard, *supra,* 14 Hofstra L.Rev. at 34–36; Comment, *Hidden Handicaps: Protection of Alcoholics, Drug Addicts, and the Mentally Ill Against Employment Discrimination under the Rehabilitation Act of 1973 and the Wisconsin Fair Employment Act,* 1983 Wis.L. Rev. 725, 745–49 (1983); *see also Ansonia Bd. of Educ. v. Philbrook,* 479 U.S. 60, 72–73, 107 S.Ct. 367, 374, 93 L.Ed.2d 305 (1986) (Marshall, J., concurring and dissenting) (discussing leave of absence as accommodation in Title VII religious discrimination context); *Kendall v. United Air Lines,* 494 F.Supp. 1380, 1390–91 (N.D.Ill. 1980) (same). In early August 1987, Cain's disability due to pneumonia was temporary and his condition was improving. A leave of absence would have allowed the plaintiff to endure the remainder of his AIDS-related pneumonia and then resume work as regional partner. Moreover, a medical leave would have supplied Cain and his physician with a chance to design a treatment program for his condition, which may well have improved his ability to perform. "As long as at the time of [Cain's removal], there were 'plausible reasons to believe that the handicap [could have been] accommodated' by the leave of absence, [Hyatt] is responsible for its failure to offer such a leave." *Kimbro,* 889 F.2d at 878 (quoting *Prewitt v. United States Postal Serv.,* 662 F.2d 292, 310 (5th Cir.1981)). *Accord Dean v. Municipality of Seattle,* 104 Wash.2d 627, 708 P.2d 393 (1985).

During August 1987, Hyatt also could have supplemented the leave of absence accommodation with other measures. In particular, Croyle and Fisher could have continued to shoulder the regional partner duties, just as they did during part of July, and facilitated Cain's desire to fulfill a portion of his job responsibilities by phone or by sending staff to visit him in the hospital or at home. Such temporary modifications in scheduling and duties and the provision of additional assistance are plainly contemplated by the reasonable accommodation doctrine. 16 Pa.Code § 44.14.

■ The Court cannot credit the defendants' assertions that accommodation would have created an undue hardship. As noted earlier, the evidence adduced at trial established that Cain's disability was not job related in any notable respect from September 1987 until June 1988. He therefore would not have required any cognizable accommodation at all during that period. Nor can the Court grant credence to the claim that because the plaintiff faced a shortened career span his tenure would have disrupted the continuity of leadership in the Philadelphia region. At the time Hyatt replaced Cain with Fisher, Fisher's

express commitment to the region was for no more than one year.

Additionally, Hyatt has not shown that accommodation of Cain during August 1987, by leave of absence or otherwise, entailed an undue burden. Indeed, the methods of accommodation outlined previously are not materially different than those utilized when a regional partner takes pregnancy leave. The defendants' thesis at trial, however, was that because Fisher had an offer to take the regional partner post in Denver, which was where Fisher preferred to go, Hyatt immediately had to promote him to the Philadelphia regional partnership or else lose him to Denver. If they had not done so, the defendants claimed, the Philadelphia position would have been left empty. This purported exigency of Hyatt's own manufacture, however, simply cannot justify its failure to accommodate. There was no evidence that Hyatt would have incurred any significant costs either by simply retaining the status quo for another month or by permitting Fisher to move to Denver and leave the region in the hands of Croyle and Willis for a short period of time.

■ The defendants stated at trial that their offer of the Falls Church staff attorney position was an attempt to accommodate the plaintiff's disability. This is a feeble post hoc rationalization. First, at the time Cain was terminated, Hyatt's duty was to accommodate the plaintiff in the position that he had held previously, that of regional partner. See, e.g., 43 Pa.Stat.Ann. § 954(p) (defining non-job related handicap as one that "does not substantially interfere with the ability to perform the essential functions of the employment which a handicapped person applies for, is engaged in or has been engaged in." (emphasis added)). To equate accommodation with the prohibited conduct itself, such as summary removal or demotion because of non-job related handicap, eviscerates not only the concept of accommodation, but the entire Act itself. Second, the asserted accommodation was not reasonable. The staff attorney job is more physically demanding and attracts substantially less compensa-

tion and prestige than the regional partner position. Further, it is a non-managerial position involving qualitatively different duties than those borne by the regional partner. Cain himself had never been a staff attorney, and the defendants were well aware that the plaintiff had no interest in making court appearances or advising clients and that he originally had accepted employment with the Hyatt organization because he had desired a management-oriented position. Even before they made the ostensible offer, the defendants knew that Cain would reject it.

■ Finally, the defendants raised the idle claim that Cain breached his duty to cooperate. " '[T]he statutory burden to accommodate rests with the employer,' and the employee's 'duty to make a good faith attempt to satisfy his needs through means offered by the employer,' is irrelevant until the employer satisfies its initial obligation" to attempt accommodation. Toledo, 892 F.2d at 1488–49 (quoting Brener v. Diagnostic Center Hosp., 671 F.2d 141, 146 (5th Cir.1982)). Accord Anderson v. General Dynamics Convair Aerospace Div., 589 F.2d 397, 401 (9th Cir.1978) ("The burden was upon the [employer], not [the employee], to undertake initial steps toward accommodation."), cert. denied, 442 U.S. 921, 99 S.Ct. 2848, 61 L.Ed.2d 290 (1979). Because the offer of alternate employment, even assuming it constituted attempted accommodation, came after the unlawful termination, Cain did not breach his duty to cooperate. See Toledo, 892 F.2d at 1489.

### C.

The Court need not dwell on the issue of causation. In General Electric Corp. v. Pennsylvania Human Relations Comm'n, 469 Pa. 292, 365 A.2d 649 (1976), and later in Winn v. Trans World Airlines, 506 Pa. 138, 484 A.2d 392 (1984), the Supreme Court of Pennsylvania applied to the PHRA the evidentiary framework that the United States Supreme Court had formulated for most Title VII cases in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). "[T]he McDonnell Douglas test," however,

"is inapplicable where the plaintiff presents direct evidence of discrimination." *Trans World Airlines v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 621–22, 83 L.Ed.2d 523 (1985). Thus, when the evidence reveals that both legal and illegal considerations lay behind the employment action, *see Price Waterhouse v. Hopkins*, —— U.S. ——, ——, 109 S.Ct. 1775, 1790, 104 L.Ed.2d 268 (1989), and the plaintiff demonstrates that the impermissible consideration was a "motivating," *id.* at ——, 109 S.Ct. at 1790 (plurality opinion), or "substantial," *id.* at ——, 109 S.Ct. at 1795 (White, J., concurring); *id.* at ——, 109 S.Ct. at 1805 (O'Connor, J., concurring), factor in the adverse employment decision, the employer may prevail only if it proves by a preponderance of the evidence that it would have taken the same action with the illegitimate motive removed from the calculus. *Cf. Rozanski v. A–P–A Transp., Inc.*, 512 A.2d 335, 341 (Me.1986) (under Maine law "once an employee proves that he was the victim of unlawful employment discrimination [on the basis of handicap], the burden then shifts to the employer to prove by clear and convincing evidence that absent any unlawful discrimination the employee would not have been hired in any event.").

■ In this case, because the plaintiff showed that his non-job related handicap was the dispositive, or but-for, cause of his termination, the proof goes far beyond that which is necessary. *Cf. Bellissimo v. Westinghouse Elec. Corp.*, 764 F.2d 175, 179 (3d Cir.1985), *cert. denied*, 475 U.S. 1035, 106 S.Ct. 1244, 89 L.Ed.2d 353 (1986). There is no question that the defendants would not have removed Cain as regional partner in July if he had not contracted AIDS. Croyle and Willis acknowledged that although they had perceived Cain to be struggling in the position, they were not ready to terminate him for inadequate performance. Moreover, Croyle rebuffed Cain's offer to resign a month before he was fired. The Court therefore easily concludes that Hyatt's "decision was made 'because of' consideration of the illegitimate factor," namely, Cain's non-job related handicap. *Price Waterhouse*, —— U.S.

at ——, 109 S.Ct. at 1804 (O'Connor, J., concurring).

## D.

By its terms the PHRA authorizes significantly broader relief for victims of discrimination than does Title VII or the Rehabilitation Act. *See, e.g., Protos v. Volkswagen of America, Inc.*, 797 F.2d 129 (3d Cir.) (holding compensatory and punitive damages not available in employment discrimination actions under Title VII), *cert. denied*, 479 U.S. 972, 107 S.Ct. 474, 93 L.Ed.2d 418 (1986). In addition to permitting "affirmative action" such as reinstatement and backpay, the PHRA empowers a court to award "any other legal or equitable relief" that the court "deems appropriate." 43 Pa.Stat.Ann. § 962(b). " 'Legal or equitable relief' includes damages for humiliation and mental anguish." *Pennsylvania Human Relations Comm'n v. Zamantakis*, 478 Pa. 454, 459, 387 A.2d 70, 73 (1978). The Court predicts that by this same reasoning, *see Tull v. United States*, 481 U.S. 412, 422, 107 S.Ct. 1831, 1838, 95 L.Ed.2d 365 (1987) (punitive damages remedy is form of legal relief), and because of the statute's sweeping remedial purpose and language, the Pennsylvania Supreme Court would rule that punitive damages may be imposed under the PHRA. *Cf. Woodson v. AMF Leisureland Centers, Inc.*, 842 F.2d 699, 701–03 (3d Cir.1988) (predicting Pennsylvania will allow punitive damages in wrongful discharge cases).

■ Cain is entitled to backpay. The evidence shows that he received his last paycheck on July 28, 1987 and that he could have worked until June 13, 1988. At the time of termination, the plaintiff's salary was $44,000 annually. The Court therefore awards $38,696.55 in backpay and $4,191.63 in simple interest at the legal rate of six percent.

■ Plaintiff's counsel's post-trial repudiation of Dr. Pistole's opinion that Cain could not have discharged his duties after June 13, 1988 is thoroughly reprehensible. Apparently counsel believe that even if the Court were to discard the clear and carefully rendered view of their own expert, it

then would speculate in the plaintiff's favor about how long he could have worked. Perhaps it was this misguided assumption that induced the plaintiff's attorneys initially to withhold from the Court Dr. Pistole's extremely probative testimony. In any event, the defendants' unconditional offer of reinstatement and backpay on June 28, 1988 tolled the accrual of backpay liability at approximately the same time that Cain become incapacitated. *See Ford Motor Co. v. EEOC,* 458 U.S. 219, 232, 102 S.Ct. 3057, 3066, 73 L.Ed.2d 721 (1982) (Title VII); *Barron v. Safeway Stores, Inc.,* 704 F.Supp. 1555, 1569–70 (E.D.Wash.1988) (Washington state law).

■ The record also is replete with evidence that Hyatt inflicted mental anguish and humiliation on the plaintiff. He was dismissed from his job only days after learning he had a fatal, dreaded illness. This conduct was a substantial contributing cause of the plaintiff's reactive depression, which has required medical treatment. The Court awards Cain $65,000.00 for the mental anguish and humiliation attributable to the defendants' unlawful actions.

■ Under Pennsylvania law, the standards set forth in section 908 of the *Restatement of Torts* (1939) govern the application of punitive damages, which are awarded to punish a person for outrageous conduct, *Chuy v. Philadelphia Eagles Football Club,* 595 F.2d 1265, 1277 (3d Cir.1979), "that is, for acts done with a bad motive or with a reckless indifference to the interests of others." *Chambers v. Montgomery,* 411 Pa. 339, 344, 192 A.2d 355, 358 (1963); *see also Woodson,* 842 F.2d at 703; *Medvecz v. Choi,* 569 F.2d 1221, 1226–27 (3d Cir.1977). The Court finds under all the circumstances of this case that the defendants' conduct was not merely inexcusably insensitive and illegal, but was so outrageous that the sanction of punitive damages is warranted.

The defendants, in utter disregard of Cain's rights, summarily removed the plaintiff from his position while he lay in the hospital, just days after he had honestly confided to them he had AIDS. Cain had wanted to return to his job as regional partner and pleaded with Croyle to permit him to do so. Having failed to receive any assurances from the defendants that he would be allowed to remain with the firm as a partner, Cain became depressed and upset, so much so that his treating physician advised the defendants that they should not visit him again until he could recuperate more fully. Yet, two days later the defendants told Cain what he already knew, that he had been terminated.

The defendants were well aware that Cain would require a short period to recover and that his condition was improving. They refused, however, to attempt even the most meager form of accommodation or endeavor to ascertain whether he could do the work of regional partner. They did not bother to consult with the plaintiff or wait until he had exhausted his sick time before taking action against him. At best, the defendants offered him an entry-level position, which paid about half of his annual salary of $44,000. This was despite the fact that Cain had shown himself to be a brilliant attorney with a promising future. He had been selected by the defendants to participate in their Fast Track Program, had performed in such an outstanding manner that he had been promoted to regional partner, and had earned a ten percent raise in salary only months after starting with the firm. Within days of learning Cain had AIDS, the defendants switched this young lawyer onto another fast track—one calculated to remove him from the organization.

In the weeks immediately prior to his diagnosis, the plaintiff had experienced physical difficulties, complained of being tired, and began to do and say things that were inconsistent with his former self. The record is devoid of any evidence that the defendants considered that the conduct which they now characterize as showing he was a poor regional partner may well have been a manifestation of his AIDS condition. The defendants did not wait for him to receive treatment. They did not afford him an opportunity to prove he could be a productive, functioning partner in the firm. Their actions were a corrupt assault on the dignity of the plaintiff. The Court assess-

es $50,000 in punitive damages against the defendants.

In consequence, the plaintiff is awarded total damages in the amount of $157,-888.18. An order follows.

## ORDER

AND NOW, this 3d day of April, 1990, for the reasons set forth in this Court's Memorandum of April 3, 1990;

IT IS ORDERED that judgment in the above-captioned action is entered in favor of Plaintiffs and that Defendants shall pay to Plaintiffs the sum of one hundred and fifty seven thousand, eight hundred and eighty eight dollars and eighteen cents ($157,888.18) in damages.